# EXHIBIT A

MASSOOD LAW GROUP, LLC
50 Packanack Lake Road
Wayne, NJ 07470
(973) 696-1900
PETER DE FRANK, ESQ. -035282007
Attorneys for *Plaintiff(s)*

| | |
|---|---|
| **KEVIN AMORUSO and RENEE AMORUSO (per quod),** | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: ESSEX COUNTY |
| Plaintiff(s), | DOCKET NO. |
| v. | *Civil Action* |
| **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),** | **COMPLAINT, DEMAND FOR TRIAL BY JURY, DESIGNATION OF TRIAL ATTORNEY, DEMAND FOR ANSWERS TO INTERROGATORIES, NOTICE TO PRODUCE, SUPPLEMENTAL INTERROGATORIES, REQUEST FOR ADMISSIONS and DEMAND FOR INSURANCE INFORMATON** |
| Defendant(s). | |

      Plaintiff, **KEVIN AMORUSO and RENEE AMORUSO (per quod),** residing at 112

Cheshire Lane, Ringwood, New Jersey, complaining against the Defendants, through counsel

says the following against, Defendants, **BJ'S WHOLESALE CLUB, INC., (a company that**

**conducts business in Essex County, New Jersey); CRESSKILL HILLS, LLC.; JOHN**

**DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10**

**(fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties),**

**XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10**

**(fictitious parties),** through counsel says the following:

## COUNT ONE

1.　　On or about **June 24, 2017,** Plaintiff, **KEVIN AMORUSO**, was lawfully on the premises commonly known as **BJ'S WHOLESALE CLUB, Inc.,** located at **110 State Route 23, Riverdale, New Jersey, 07457**.

2.　　At all relevant times, Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties)**, owned a property/premises located in and around **110 State Route 23, Riverdale, New Jersey, 07457**.

3.　　At said time and place, Plaintiff, **KEVIN AMORUSO**, was caused to fall as a result of a slippery condition while walking inside said premises due to the negligence, carelessness, and/or recklessness of the Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties).**

4.　　Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),** were negligent, careless, and/or reckless in that they including, but not limited to:

(a)    did not keep the premises in a safe condition;

(b)    did not exercise due and proper care;

(c)    caused/created a dangerous and hazardous condition to exist;

(d)    failed to provide proper safeguards and warnings on its property;

(e)    failed to provide proper, safe walking surfaces for persons allowed and invited to use said property, including Plaintiff, **KEVIN AMORUSO**;

(f)    created, engaged in, and/or permitted a negligent mode of operation;

(g)    knew and/or should have known of a dangerous condition and failed to take reasonable measure to prevent or eliminate the condition;

(h)    failed to adequately clean a hazardous, slippery walking surface;

(i)    failed to conduct adequate inspection;

(j)    made unreasonable repairs and/or failed to make reasonable repairs;

(k)    failed to properly water seal and/or otherwise maintain the roof;

(l)    failed to maintain the roof;

(m)    negligently constructed the roof;

(n)    created, engaged in, and/or permitted a negligent mode of operation;

(o)    was/were otherwise negligent.

5.    Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),,** are/were vicariously liable for the negligence, carelessness, and/or recklessness of their agents, servants, and/or employees.

6.     Defendants **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),** as owners of the property/premises owed a non-delegable duty of care to the Plaintiffs.

7.     As a direct and proximate result of the negligence, carelessness, and/or recklessness of

the Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),** as aforesaid, the Plaintiff, **KEVIN AMORUSO**, was caused to suffer severe and permanent bodily injuries, has suffered and will in the future continue to suffer great and excruciating pain in mind and body, has and will continue to lose enjoyment of life, has become and will in the future continue to be sick, sore, lame, disabled and prevented from performing and tending to his duties, affairs and foreseeable activities, and has expended and will in the future continue to expend large sums of money for necessary medical care and attention in an attempt to effect a cure.

WHEREFORE, Plaintiff, **KEVIN AMORUSO**, respectfully demands judgment against Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS**

**PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),,** jointly, severally or in the alternative for compensatory damages, interest, costs of suit, and such other and further relief as the Court deems just and proper.

**SECOND COUNT**

1.      Plaintiff, **KEVIN AMORUSO**, repeats and realleges the allegations contained in the First Count of the Complaint as if set forth herein at length.

2.      At all relevant times, Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),,** managed, controlled, operated, maintained, leased and/or were otherwise responsible for the upkeep, operation, cleanliness, quality, maintenance and/or repair of the premises, including the walking areas/surfaces in and around the area where Plaintiff was caused to fall.

3.      At said time and place, Plaintiff, **KEVIN AMORUSO**, was caused to fall as a result of

a slippery condition while walking inside said premises due to the negligence, carelessness, and/or recklessness of Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties).**

4.     Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),** were negligent, careless, and/or reckless in that they including, but not limited to:

      (a)    did not keep the premises in a safe condition;

      (b)    did not exercise due and proper care;

      (c)    caused/created a dangerous and hazardous condition to exist;

      (d)    failed to provide proper safeguards and warnings on its property;

      (e)    failed to provide proper, safe walking surfaces for persons allowed and invited to use said property, including Plaintiff, **KEVIN AMORUSO**;

      (f)    created, engaged in, and/or permitted a negligent mode of operation;

      (g)    knew and/or should have known of a dangerous condition and failed to take reasonable measure to prevent or eliminate the condition;

      (h)    failed to adequately clean a hazardous, slippery walking surface;

      (i)    failed to conduct adequate inspection;

      (j)    made unreasonable repairs and/or failed to make reasonable repairs;

      (k)    failed to properly water seal and/or otherwise maintain the roof;

      (l)    failed to maintain the roof;

      (m)    negligently constructed the roof;

      (n)    created, engaged in, and/or permitted a negligent mode of operation;

      (o)    was/were otherwise negligent.

5.     Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),),** are/were vicariously liable for the negligence, carelessness, and/or recklessness of their agents, servants, and/or employees.

6.   As a direct and proximate result of the negligence, carelessness, and/or recklessness of the Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),** as aforesaid, Plaintiff, **KEVIN AMORUSO**, was caused to suffer severe and permanent bodily injuries, has suffered and will in the future continue to suffer great and excruciating pain in mind and body, has and will continue to lose enjoyment of life, has become and will in the future continue to be sick, sore, lame, disabled and prevented from performing and tending to his duties, affairs and foreseeable activities, and has expended and will in the future continue to expend large sums of money for necessary medical care and attention in an attempt to effect a cure.

7.   WHEREFORE, Plaintiff, **KEVIN AMORUSO**, respectfully demands judgment against the Defendants **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10**

**(fictitious parties),** jointly, severally or in the alternative for compensatory damages, interest, costs of suit, and such other and further relief as the Court deems just and proper.

### THIRD COUNT

1.     Plaintiff, **KEVIN AMORUSO**, repeats and realleges the allegations contained in the First and Second Counts of the Complaint as if set forth herein at length.

2.     At all relevant times, Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),** were responsible for the construction, maintenance, repair, inspection, upkeep, operation, water proofing and/or water sealing of the roof and interior of the property where plaintiff was caused to fall.

3.     At all relevant times, Plaintiff, **KEVIN AMORUSO**, was caused to fall as a result of negligent, careless, and/or reckless acts and omissions by an individual or corporation contracted, responsible for, and/or entrusted with the construction, maintenance, repair, inspection, upkeep, operation, water proofing and/or water sealing of the roof and interior of the property where plaintiff was caused to fall.

4.     Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),** are/were vicariously liable for the negligence, carelessness, and/or recklessness of their agents, servants, and/or employees.

5.    As a direct and proximate result of the negligence, carelessness, and/or recklessness of the Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),** as aforesaid, the Plaintiff, **KEVIN AMORUSO**, was caused to suffer severe and permanent bodily injuries, has suffered and will in the future continue to suffer great and excruciating pain in mind and body, has and will continue to lose enjoyment of life, has become and will in the future continue to be sick, sore, lame, disabled and prevented from performing and tending to his duties, affairs and foreseeable activities, and has expended and will in the future continue to expend large sums of money for necessary medical care and attention in an attempt to effect a cure.

WHEREFORE, Plaintiff, **KEVIN AMORUSO**, respectfully demands judgment against the Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),** jointly, severally or in the alternative for compensatory damages, interest, costs of suit, and such other and further relief as the Court deems just and proper.

### FOURTH COUNT

1.    Plaintiff, **KEVIN AMORUSO**, repeats and realleges all of the allegations contained in the First, Second, and Third Counts of the Complaint as if set forth herein at length.

2.      The Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),** whose identities are presently unknown, owned, managed, maintained, controlled, and/or were otherwise responsible for property management and/or roof and building construction/repair/inspection/management/maintenance at the property located at **110 State Route 23, Riverdale, New Jersey, 07457.**

3.      Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),** negligently, carelessly, and/or recklessly owned, managed, maintained, repaired, constructed, inspected and/or controlled premises, including all roofing, roof and building construction/repair/inspection/management/maintenance causing Plaintiff, **KEVIN AMORUSO,** to fall.

4.      Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),** were negligent, careless, and/or reckless in that they including, but not limited to:

(a)     did not keep the premises in a safe condition;

(b)     did not exercise due and proper care;

(c)     caused/created a dangerous and hazardous condition to exist;

(d)     failed to provide proper safeguards and warnings on its property;

(e)     failed to provide proper, safe walking surfaces for persons allowed and invited to use said property, including Plaintiff, **KEVIN AMORUSO**;

(f)     created, engaged in, and/or permitted a negligent mode of operation;

(g)     knew and/or should have known of a dangerous condition and failed to take reasonable measure to prevent or eliminate the condition;

(h)     failed to adequately clean a hazardous, slippery walking surface;

(i)     failed to conduct adequate inspection;

(j)     made unreasonable repairs and/or failed to make reasonable repairs;

(k)     failed to properly water seal and/or otherwise maintain the roof;

(l)     failed to maintain the roof;

(m)     negligently constructed the roof;

(n)     created, engaged in, and/or permitted a negligent mode of operation

(o)     was/were otherwise negligent.

5.     Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),** are/were vicariously liable for the negligence, carelessness, and/or recklessness of their agents, servants, and/or employees.

6.      Owners of the premises owed a non-delegable duty of care to the Plaintiff, **KEVIN AMORUSO.**

7.      As a direct and proximate result of the negligence, carelessness, and/or recklessness of the Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),** as aforesaid, the Plaintiff, **KEVIN AMORUSO**, was caused to suffer severe and permanent bodily injuries, has suffered and will in the future continue to suffer great and excruciating pain in mind and body, has and will continue to lose enjoyment of life, has become and will in the future continue to be sick, sore, lame, disabled and prevented from performing and tending to his duties, affairs and foreseeable activities, and has expended and will in the future continue to expend large sums of money for necessary medical care and attention in an attempt to effect a cure.

WHEREFORE, Plaintiff, **KEVIN AMORUSO**, respectfully demands judgment against the Defendants, **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),,** jointly, severally or in the alternative for compensatory damages, interest, costs of suit, and such other and further relief as the Court deems just and proper.

MASSOOD LAW GROUP, LLC
Attorneys for Plaintiff(s)

BY: _____
PETER DE FRANK, ESQ.

Dated: April 17, 2019

## JURY DEMAND

Pursuant to <u>R.</u> 1:8-2(b), Plaintiff hereby demands a Trial by Jury on all the issues raised

in the within Pleadings.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to <u>R.</u> 4:25-4, PETER DEFRANK, is designated as trial counsel.

## TIME UNIT RULE

Plaintiff(s) intend to use the Time Unit Rule Pursuant to <u>R.</u> 1:7-1(b).

MASSOOD LAW GROUP, LLC
Attorneys for Plaintiff(s)

BY: _____
PETER DE FRANK, ESQ.

Dated: April 17, 2019

## CERTIFICATION

I hereby certify that the matter in controversy is not the subject of any other action pending in any Court or of a pending arbitration proceeding, nor is any such action or proceeding presently contemplated.

MASSOOD LAW GROUP, LLC
Attorneys for Plaintiff(s)

BY:
PETER DE FRANK, ESQ.

Dated: April 17, 2019

# EXHIBIT B

LEASE

This Lease, dated January 2⁷, 1997, by and between Heller-Riverdale, L.L.C., a New Jersey limited liability company, as landlord, (hereinafter referred to as "Landlord"), and Waban Inc., a Delaware corporation, as tenant (hereinafter referred to as "Tenant").

## ARTICLE I

### Premises; General Data

1.1   In consideration of the rents, agreements and conditions herein reserved and contained on the part of Tenant to be paid, performed and observed, Landlord does hereby demise and lease to Tenant, and Tenant hereby hires from Landlord for the term hereinafter set forth and upon and subject to the terms and provisions of this Lease, the premises described below as the Demised Premises together with (a) the nonexclusive easement, right and privilege for Tenant and its customers, employees and invitees and the customers, employees and invitees of any assignee, sublessee, concessionaire or licensee of Tenant permitted by this Lease or consented to by Landlord, to use the areas of land abutting the Demised Premises (as described in Schedule A attached hereto) (the "Lot") on which the Common Areas (as hereinafter defined) are to be located and Landlord's rights to use the Common Areas located on the HD Tract (hereinafter defined) pursuant to the Reciprocal Easement Agreement to be executed by Landlord and Home Depot, Inc. substantially in the form attached hereto as Schedule H (the "REA"), with only such charges therefore as are specifically set forth herein, and to use the Access Improvements and the Pylon (as hereinafter respectively defined); and (b) such other easements, rights, privileges and restrictions as set forth in Schedule A-1 attached hereto.

1.2   The following defines or references certain terms used in this Lease (which term includes all exhibits, riders and schedules attached hereto and made a part hereof, along with all amendments to the same made from time to time):

| | |
|---|---|
| Access Improvements: | The road improvements described in Schedule C attached hereto. |
| Outside Delivery Date: | November 1, 1998 |
| Approvals Date: | April 1, 1997 |
| BJ's Project: | The development described in Schedule B. |
| BJ's Tract: | The parcel of land labelled "BJ's Tract" on the Site Plan. |
| Building: | The Building described in Schedule B as the same may from time to time be altered as provided in this Lease. |
| Broker: | None |
| Commencement Date: | The date determined under Section 4.6 of this Lease. |
| Common Areas: | The parking areas, access drives and other improvements described in Section 6.1 of this Lease. |

| | |
|---|---|
| Delivery Date: | The date determined under Section 4.4 of this Lease. |
| Demised Premises: | The land shown as "Retail E, 108,532 S.F." on the Site Plan, and the Building to be constructed thereon. |
| Floor Area: | The area computed by measurements made to and from the outside of exterior walls of the building in question exclusive of mezzanines not open to customers and occupied incidental to ground floor retail operation, and excluding any outdoor or covered garden center. |
| HD Tract: | The parcel of land labelled "HD Tract" on the Site Plan. |
| Inducement Tenant: | Home Depot |
| Landlord's Address: | ███████████████████ |
| Landlord's Construction Work: | The work described in Schedule C attached hereto. |
| Landlord's Construction Work Commencement Date: | November 1, 1997 |
| Main Street: | New Jersey State Route 23 |
| Pylon: | The pylon sign described in Schedule B attached hereto. |
| Shopping Center: | The retail development to be called Riverdale Plaza, comprised of the Lot and the HD Tract.  Tenant acknowledges that this definition does not imply that the HD Tract is or will be in common ownership with the Lot. |
| Site Plan: | The plan identified as such in Schedule C. |
| Tenant's Address: | ███████████ |
| Tenant's Lot Share: | That fraction the numerator of which shall be the Floor Area of the Building and the denominator of which shall be the Floor Area of all buildings on the Lot (including the Building) as shown on the Site Plan.  Tenant's Lot Share shall automatically change if the Floor Area of any building on the Lot changes. |
| Tenant's SC Share: | That fraction the numerator of which shall be the Floor Area of the Building and the denominator of which shall be the Floor Area of all buildings in the Shopping Center (including the Building) as shown on the Site Plan.  Tenant's SC Share shall automatically change if the Floor Area of any building included in the Shopping Center changes |

Term:                        See Sections 2.1 and 2.2 of this Lease.

    1.3    The following schedules, with the following headings, are attached to, made a part of and incorporated by this reference in this Lease as if fully set forth herein:

| | |
|---|---|
| Schedule A | Description of Lot |
| Schedule A-1 | Easements, rights, privileges and restrictions |
| Schedule B | Identification of Building, Service Areas, Access Improvements, Pylon and other improvements. |
| Schedule B-1 | Plan of Pylon |
| Schedule C | Tenant's Requirements |
| Schedule C-1 | List of Plans |
| Schedule D | Subordination, Non-Disturbance and Attornment Agreement |
| Schedule E | Title Restrictions |
| Schedule F | Form of Commencement Date Agreement |
| Schedule G | Short Form Lease |
| Schedule H | Form of REA |

ARTICLE II

Term of Lease

    2.1    TO HAVE AND TO HOLD the Demised Premises unto Tenant for the original term commencing on the Commencement Date and continuing until the twentieth (20th) anniversary of the Commencement Date, unless said term shall be earlier terminated or extended, as provided in this Lease. As soon as the Commencement Date has been determined, the parties hereto agree to execute a supplemental instrument in the form attached hereto as Schedule F memorializing the Commencement Date.

    2.2    Tenant shall have eight (8) successive five (5) year options of extension (with each such five-year extension being referred to herein as an "Extension Period"), provided written notice of the election of any such option shall be sent by Tenant to Landlord not less than nine (9) months prior to the expiration of the then current term (original or as previously extended). If Landlord has not received notice of the election of any such option from Tenant fifteen (15) days prior to the expiration of the time to make such election, then Landlord shall use its best efforts to give Tenant at least ten (10) days' notice of the expiration of the time to extend the then current term, it being the intent of the parties that Tenant's rights to extend the term shall not be lost through inadvertence, but the failure of Landlord to give such notice shall not increase the time for Tenant to so elect to extend the term or subject Landlord to any liability to Tenant.

Tenant shall also have the right, at its election, to extend the original term, or the original term as then extended for the period beginning with the expiration of the term (original or as previously extended) and ending upon the January 31st next following (herein referred to as the "Extra Period") provided that Tenant shall give Landlord notice of the exercise of its election at least nine (9) months prior to the expiration of the original term or the original term as previously extended, as the case may be.  If Tenant extends the term for the Extra Period the Base Rent (hereinafter defined) for the Extra Period shall be at the rate of, in the case unexercised rights of extension remain under the Lease, the Base Rent payable for the next following Extension Period and in the case where no Extension Periods remain, the Base Rent for the Extension Period immediately preceding the Extra Period.

2.3     If such option(s) are exercised, the term of this Lease shall be automatically extended for the period of the next following Extension Period or, if applicable, the Extra Period without the requirement of any further instrument, upon all of the same terms, provisions and conditions set forth in this Lease, including, without limitation, the Base Rent during the Extension Period.

2.4     In the event that any of the aforesaid option(s) to extend are exercised, all references contained in this Lease to the term of this Lease, whether by number of years or number of months, shall be construed to refer to the original term hereof, as extended as under Section 2.2.

2.5     Landlord represents to Tenant that Inducement Tenant has entered into an agreement with Landlord to purchase the fee title to the HD Tract, and agrees that upon this sale of the HD Tract the REA will constitute a first lien thereon.

## ARTICLE III

### Base Rent; Percentage Rent

3.1     Tenant covenants and agrees to pay to Landlord at Landlord's Address or at such other place as Landlord shall from time to time designate in writing, subject to the provisions of Section 3.3 of this Lease, base rent ("Base Rent") for the Demised Premises as follows:

(A)     For and with respect to the first one hundred twenty (120) calendar months of the original term, including the partial month, if any, immediately following and including the

(B)     For the balance of the original term and, if Tenant's option therefor is extended, for any Extension Period, Base Rent shall be determined as follows: Each of the tenth (10th) and fifteenth (15), anniversaries of the Commencement Date and the first day of each Extension Period, if any, is herein referred to as an "Adjustment Date".

As of each Adjustment Date, the annual rate of Base Rent payable for the period ending

The term "Index" shall mean the Consumer Price Index for all Urban Consumers, Seasonally Adjusted, New York - No. New Jersey - Long Isl., NY-NJ-CT, All Items (1982-84=100), as published by the Bureau of Labor Statistics of the United States Department of Labor, and the term "Base Index" shall mean the Index for the month in which this Lease is dated and, beginning with the first Adjustment Date, the Index for the month in which commenced the portion of the Term for which the applicable Prior Base Rent was in effect. In the event that the Index is not then in existence, the parties shall use such equivalent price index as is published by any successor governmental agency then in existence or, if none, then by such non-governmental agency as may then be publishing such an equivalent price index, in lieu of and adjusted to the Index. If the Index shall cease to use the 1982-84 average of 100 as the basis of calculation or if a substantial change is made in the terms or numbers of items contained in the Index, the Base Index shall be adjusted to conform to such change, using such new computation thereof, if available, as shall be employed by the United States Department of Labor in computing same. If the parties shall be unable to agree upon the amount of the annual Base Rent to be determined for any period, as aforesaid, then the parties shall promptly resolve such dispute by arbitration in Boston, Massachusetts, by the American Arbitration Association or its successors at the time of any submission.

3.2     Monthly installments of Base Rent shall be payable on the first day of each and every calendar month, in advance, during the term hereof, the first such payment to be due on the Commencement Date. If a monthly installment of Base Rent is postmarked more than ten (10) days after the date it is due more than once in a twelve-month period, Tenant shall pay Landlord interest on any such installment becoming overdue during the remainder of such twelve-month period at the interest rate for late Landlord reimbursements to Tenant as described in Section 13.2, calculated from the day such installment was due to the date of payment. In the event Tenant is obligated to pay Base Rent for a period which is less than a calendar month, the Base Rent set forth in Section 3.1 shall be prorated based upon the ratio which the number of days in such partial month bears to the total number of days in the month in which such partial month occurs.

3.3     If after completion of Landlord's Construction Work (as defined in Schedule C attached hereto), the Building shall contain more than two hundred (200) square feet less than 108,532 square feet of Floor Area (i.e., 108,331 square feet) and Tenant elects to accept the Building notwithstanding the failure of Landlord's Construction Work to so comply with the Final Details (as defined in said Schedule C), then, as Tenant's sole remedy as a result thereof, the Base Rent payable by Tenant pursuant to Section 3.1 shall be reduced proportionately, unless the Floor Area is reduced due to a change order requested by Tenant (which change order expressly acknowledges that it shall decrease the Floor Area), in which event Base Rent shall not be reduced. If the Floor Area of the Building shall increase due to a change order requested by Tenant in writing (which change order shall expressly acknowledge that it shall increase the Floor Area), the Base Rent payable by Tenant pursuant to Section 3.1 shall be increased proportionately.

3.4     If Tenant shall elect to extend the term of this Lease beyond the thirtieth anniversary of the Commencement Date (the "Percentage Rent Commencement Date"), then for the third Extension Period and for the remainder of the term, Tenant shall also pay to Landlord as additional rent ("Additional Rent") percentage rent ██████████████████████

3.5      A "lease year" is defined to mean any twelve-month period after the Percentage Rent Commencement Date commencing upon a February 1 except, however, if the Percentage Rent Commencement Date shall occur on a day other than the first day of February, the first lease year shall commence on the Percentage Rent Commencement Date and end on the last day of January which shall be more than six months (but not more than eighteen months) after the Percentage Rent Commencement Date.



ID # 6577v08/8151-18
1/24/97



## ARTICLE IV

Approvals; Landlord's Construction Work;
Pre-Term Occupancy and Possession; Commencement Date

4.1    Promptly after the execution and delivery of this Lease, Landlord shall, at Landlord's sole cost and expense, proceed with all diligence to obtain the Approvals (as hereinafter defined) for the BJ's Project (as defined in Schedule B attached hereto).  As used herein, the term "Approvals" shall mean all permits, approvals, variances, licenses and other determinations required under the provisions of applicable federal, state, county and municipal laws, ordinances, regulations and administrative rulings to construct and operate the BJ's Project (other than a building permit, a certificate of occupancy and licenses and similar approvals relating to the sale of specific merchandise such as alcoholic beverages), with conditions in all respects satisfactory to Tenant; provided, however, that conditions to the Approvals in accordance with the Final Details (as defined in Schedule C) or accepted by Tenant at a majority of its other stores operating in northern New Jersey, other than those relating to Sunday closings, shall be deemed satisfactory to Tenant.  No such permit, approval, variance, license or other determination shall be treated as having been obtained by Landlord under this Lease unless the same shall have been validly issued and all appeal periods applicable to such Approval have expired without the filing of an appeal or, if an appeal has been filed, the determination of the same in favor of Landlord.  If Landlord determines in the exercise of reasonable discretion that Landlord will be unable to obtain the Approvals for the BJ's Project, Landlord may elect to discontinue its efforts to obtain the Approvals by notice to Tenant, in which event this Lease shall terminate, except that Landlord shall not thereafter lease or sell the land to be included in the Lot or any buildings to be constructed thereon to any other membership or wholesale club for

a period of eighteen (18) months from such termination without first reoffering such premises to Tenant on the terms and conditions of this Lease. The provisions of the foregoing sentence shall survive such termination. In addition, if Landlord determines in the exercise of reasonable discretion that Landlord will be unable to obtain the Approvals for the BJ's Project due to physical or building constraints relating to the site, but that the Approvals could be obtained for a building with a Floor Area of less than 108,532 square feet (but not less than 90,000 square feet), Landlord shall give Tenant notice to that effect, and unless Tenant shall accept such diminution in size of the Building within thirty (30) days of such notice, this Lease shall terminate. If Tenant shall accept such diminution in size, Landlord shall continue its diligent efforts to obtain the Approvals for the BJ's Project as so reconfigured, and the parties shall enter into a conforming amendment to this Lease, which shall, among other things, recalculate the Base Rent at the same rate ▮▮▮▮▮▮▮▮▮▮ and the Floor Area of the Building. In the event Landlord shall not have obtained all Approvals before the Approvals Date, then at any time thereafter, but prior to Landlord securing the Approvals, Tenant shall have the right, at its election to terminate this Lease by giving Landlord notice thereof. Notwithstanding the foregoing sentence, if Landlord shall not have secured the Approvals before the Approvals Date, and shall give Tenant notice that Landlord anticipates obtaining the Approvals by a date specified in such notice, which date shall be no more than sixty (60) days from the giving of such notice, and Tenant shall not terminate this Lease by giving Landlord notice thereof within fifteen (15) days of receipt of Landlord's notice, then the Approvals Date shall be deemed extended to the date set forth in Landlord's notice. Landlord may utilize the provisions of the preceding sentence from time to time until the Approvals are obtained or Tenant terminates this Lease.

4.2     Landlord agrees that the work described in Schedule C attached hereto as "Landlord's Construction Work" will be commenced promptly after (a) the issuance of the Approvals required therefor and (b) the approval by Tenant of the detailed plans and specifications referred to in Schedule C as the Details. Landlord's Construction Work will be prosecuted to completion with due diligence, at Landlord's sole cost and expense, in a good and workmanlike manner with first-class materials and in compliance with all laws, ordinances and regulations of public authorities. Tenant shall cause its employees and its contractors to coordinate their work with that of Landlord's contractors, and shall make certain that its employees and contractors shall not interfere with the balance of the work in the Shopping Center. Tenant and its contractors shall take such action as may be required to avoid any jurisdictional or other labor disputes.

4.3     If Landlord's Construction Work shall not be commenced on or before Landlord's Construction Work Commencement Date, then at any time thereafter, but prior to the commencement of Landlord's Construction Work, Tenant shall have the right, at its election, to terminate this Lease by giving Landlord notice thereof. If Tenant shall cause a delay in the commencement of Landlord's Construction Work due to a failure by Tenant to observe any time limitations set forth herein, and Landlord shall have given Tenant notice of such delay within ten (10) days of the occurrence thereof, Landlord's Construction Work Commencement Date shall be extended one (1) day for each day of such delay. The commencement of Landlord's Construction Work shall mean Landlord obtaining a building permit for construction of the BJ's Project and commencement of blasting operations necessary to construct the improvements to be constructed on the Lot after completion of any drilling preparatory thereto. Notwithstanding anything else to the contrary in this Section 4.3, if Landlord shall not have commenced Landlord's Construction Work on or before Landlord's Construction Work Commencement Date, and shall give Tenant notice that Landlord anticipates commencing Landlord's Construction Work by the date specified in said notice, which date shall be no more than sixty (60) days from the giving of such notice by Landlord, and Tenant shall not terminate this Lease by giving

Landlord notice thereof within fifteen (15) days of receipt of Landlord's notice, then Landlord's Construction Work Commencement Date shall be deemed extended to the date set forth in Landlord's notice. Landlord may utilize the provisions of the preceding sentence from time to time until Landlord commences Landlord's Construction Work or Tenant terminates this Lease.

4.4     As used herein, the term "Delivery Date" shall be the day on which Landlord's Construction Work shall have progressed to such a point that the floor in the Building shall have been laid, the Building is weather tight and structurally sound, all lighting and wiring shall have been completed and shall be operating, and the heating, ventilating and air conditioning systems (sometimes herein referred to as the "HVAC") shall have been installed and shall be operating automatically, all toilets shall be operating, all work requiring scaffolding shall have been completed, the Building shall have been made secure, the Building shall have been made sufficiently neat and clean so that Tenant may (at Tenant's sole cost and expense) install its fixtures and merchandise therein without likelihood that such fixtures or merchandise shall become dirty, the sprinkler system shall have been installed and shall be operating automatically and a paved area shall have been provided which shall be adequate for access by Tenant's delivery vehicles from the Main Street and for parking thereof adjacent to the front or rear of the Building, and the following additional conditions shall have been satisfied:

(A)     Landlord shall have provided to Tenant, at least ninety (90) days prior to delivery, a notice of the date as of which Landlord will deliver the Demised Premises in the manner provided in this Section;

(B)     All Approvals shall have been obtained as provided in Section 4.1 and Landlord shall furnish to Tenant, at Landlord's cost and expense, an opinion from Lentz & Gengaro of 443 Northfield Avenue, West Orange, NJ 07052, Attn: Karen L. Rozenberg, Esquire or another law firm selected by Landlord and acceptable to Tenant confirming that all Approvals have been so issued and that all conditions contained therein have been satisfied;

(C)     Landlord shall deliver to Tenant a letter from Landlord's engineer, confirming to Tenant (and Tenant shall be permitted to rely thereon) that there is available to the Demised Premises (and the Demised Premises have been connected thereto) (a) all such public water, electricity and gas lines which shall have the capacity to furnish such amounts per unit of time as shall be required by the plans and specifications referred to in Schedule C (including, without limitation, sufficient water for air-conditioning) and (b) all such sewerage disposal facilities which shall be of such capacity as shall be required by the plans and specification referred to in Schedule C, and (c) all tie-in permits required therefor have been issued and paid for in full; and

(D)     Landlord shall deliver to Tenant such occupancy certificate or approvals of governmental authorities, if any, as shall be necessary to permit Tenant to lawfully install its fixtures.

If the Delivery Date shall not have occurred and possession of the Building in the condition required hereunder shall not have been delivered to Tenant on or before the Outside Delivery Date, as the Outside Delivery Date may have been extended pursuant to Section 17.3 hereof, then, notwithstanding Section 3.1 to the contrary, no Base Rent shall be payable for the period commencing upon the Commencement Date and containing that number of consecutive days thereafter which shall equal the number of days between the Outside Delivery Date, as the

Outside Delivery Date may have been extended pursuant to Section 17.3 hereof, and the date on which the Delivery Date occurs. For purposes of determining the Delivery Date, the fact that certain punch list items remain to be completed shall not delay the occurrence of the Delivery Date so long as such items can be completed within thirty (30) days of delivery of a punchlist by Tenant to Landlord and without interference to Tenant's use and occupancy of the Building. If Tenant shall so deliver a punchlist to Landlord within thirty (30) days of the Delivery Date, Landlord shall complete such punchlist items within thirty (30) days of receipt of such punchlist. The Delivery Date shall not be delayed for the final striping and other like improvements to the Common Areas or for completion of the Access Improvements provided as of the Delivery Date, any remaining work to be done in the Common Areas or in respect of the Access Improvements is reasonably anticipated by Tenant to require no more than sixty (60) days to complete. The foregoing shall not, however, relieve the Landlord from the obligation to complete all Landlord's Construction Work. Without limitation of Tenant's remedies, Tenant shall have the right to exercise self-help on account of Landlord's failure to so complete such punchlist items as provided in Section 13.2 of this Lease if all such punchlist items are not completed within such thirty (30) day period.

4.5    If the Delivery Date shall not have occurred on or before the Outside Delivery Date, as the Outside Delivery Date may have been extended pursuant to Section 17.3 hereof, then at any time thereafter, but prior to the occurrence of the Delivery Date, Tenant shall have the right, at its election, to terminate this Lease by giving Landlord notice thereof. Notwithstanding the preceding sentence, if the Delivery Date has not occurred before the Outside Delivery Date, and Landlord shall give Tenant notice that Landlord anticipates the occurrence of the Delivery Date by a date specified in such notice, which date shall not be more than sixty (60) days from the giving of such notice, and Tenant shall not terminate this Lease by giving Landlord notice thereof within fifteen (15) days of receipt of Landlord's notice, then the Outside Delivery Date shall be deemed extended to the date set forth in Landlord's notice. Landlord may utilize the provisions of the foregoing sentence from time to time until the Delivery Date has occurred or Tenant terminates this Lease.

4.6    Commencement Date: For the purposes of this Lease, the term "Commencement Date" shall mean and be the earlier to occur of (a) the date on which Tenant formally opens the Demised Premises for business with customers, or (b) the first day (other than a legal holiday) more than sixty (60) days after the Delivery Date and occurring between March 1st and November 15th of the calendar year, on which all of the following conditions have been satisfied:

(A)    The Building shall be free and clear of all tenants and occupants, in a structurally sound condition and with a completely watertight roof; and all plumbing, sprinkler system, HVAC system and utilities shall be in good working order; and the Landlord's Construction Work in respect of the Building, the Common Areas included in the Lot, the Pylon and the Access Improvements shall have been completed in accordance with the Final Details (all as provided in Schedule C attached to this Lease) and ready for occupancy.

(B)    Twenty (20) days shall have elapsed since Landlord shall have delivered to Tenant an occupancy certificate if such occupancy certificate is required to permit Tenant to stock its merchandise in the Building (if such occupancy certificate is not required under applicable law to stock merchandise in the Building, said twenty (20) days shall be reduced to five (5) days) and which in no way restricts the rights which Tenant otherwise has under this Lease with respect to the

ID # 6577v08/8151-18
1/24/97

-11-

Demised Premises, the Common Areas, access to the Common Areas or use of the Pylon. Such occupancy certificate may be a temporary occupancy certificate if it otherwise complies with this section and if it is customary practice in Riverdale, New Jersey, to permit businesses similar to that of Tenant located in shopping centers to open for business to the public under a temporary occupancy certificate. If Landlord delivers to Tenant such a temporary occupancy certificate, Landlord shall diligently prosecute any conditions thereon to completion and promptly thereafter obtain a permanent occupancy certificate.

(C)     Promptly after the Commencement Date, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as Schedule F.

4.7     Tenant shall have the right, without payment of rent or other charge, after the execution of this Lease and prior to the Delivery Date, with reasonable notice and at reasonable hours, to enter the Demised Premises to inspect the same. Without limitation of Landlord's obligations under Sections 17.16, Tenant agrees that any such entry shall be done at Tenant's own risk, and Landlord shall have no liability to Tenant therefore. No such entry shall be deemed as Tenant's acceptance of the Demised Premises nor as Tenant being in control of the Demised Premises.

4.8     Nothing in this Lease shall require Tenant to conduct or continue to conduct business in, or to use or occupy or continue to use or occupy, the Building and Demised Premises for any period of time or at all, provided, however, that Tenant will open for business in the Demised Premises in a manner similar to the majority of Tenant's stores operating as membership or wholesale clubs as soon after the Commencement Date as shall be practicable, and shall remain open for business for at least one full business day.

4.9     Simultaneously with the execution of this Lease, Landlord and Tenant shall execute a "short form lease", in the form attached hereto as Schedule G. Landlord shall cause such instrument to be recorded in the appropriate land records. After the Commencement Date shall be fixed, upon the written request of either Landlord or Tenant, Landlord and Tenant will enter into an amended "short form lease" or other such instrument to fix the Commencement Date of record. Upon termination of this Lease, Landlord and Tenant will, upon request of either of them execute an instrument, recordable in form, indicating that this Lease has terminated.

4.10    Landlord agrees that upon Landlord's completion of Landlord's Construction Work, the use of the Demised Premises for retail and wholesale operations as described in Schedule B, the use of the Pylon, the construction and use of the Access Improvements and the construction and use of the Common Areas included on the BJ's Tract for parking and other purposes referred to in this Lease shall be in full compliance with all laws, ordinances and regulations of public authorities (including, without limitation, zoning and building codes), all as shall be in effect at the time of Landlord's completion of Landlord's Construction Work. Landlord agrees that if any of the buildings shown on the Site Plan located on the Lot have not been constructed on the Delivery Date, construction of such buildings shall not in any way affect Tenant's use of the Demised Premises, or cause the obstruction or removal of the Pylon, or affect Tenant's use of the Access Improvements or the portion of the Common Areas located on the BJ's Tract. Landlord agrees that if at any time or times any public authorities having jurisdiction shall complain that (a) the Demised Premises, Common Areas, Pylon or Access Improvements shall not have been constructed in compliance with any law, ordinance, regulation or order of any public authority in effect prior to the Commencement Date or (b) the use of the Demised Premises, Common Areas, Pylon or Access Improvements is in violation of any such law,

ordinance, regulation or order in effect prior to the Commencement Date, and shall request compliance, and if failure to comply shall in any way affect Tenant's use of the Demised Premises, the Pylon, the Access Improvements or the Common Areas or affect any other rights of Tenant under this Lease or impose any obligation upon Tenant, then Landlord shall, upon receipt of notice of such complaint, cause such repairs, alterations or other work to be done and take such other action to remedy such violation (other than cessation of such construction or use). Tenant shall perform such repairs at its sole cost, alterations or other work to the Common Areas located on the BJ's Tract with respect to laws which shall become effective after the Commencement Date, as and to the extent set forth in Section 6.1 hereof. If by reason of such failure of compliance or by reason of such repairs, alterations or other work or remedial action done by Landlord, Tenant's use or enjoyment of the whole or any part of the Demised Premises, the Pylon, the Access Improvements or the Common Areas (except as permitted above with respect to the Common Areas not located on the BJ's Tract) is interrupted or otherwise disturbed, rent shall abate on a per diem basis in proportion to such interruption or disturbance. If such interruption or disturbance does not cease in its entirety within ninety (90) days after Tenant shall give Landlord notice thereof, then Tenant, without waiving any other rights Tenant may have against Landlord on account thereof, may terminate this Lease by giving Landlord notice thereof. Notwithstanding the foregoing sentence, if such interruption or disturbance has not ceased in its entirety within ninety (90) days of Tenant's notice, and Landlord shall give Tenant notice before the expiration of said ninety (90) day period that Landlord anticipates the cessation of such interruption or disturbance by a date specified on such notice, which date shall be no more than sixty (60) days from the giving of such notice by Landlord, and Tenant shall not terminate this Lease by giving Landlord notice thereof within fifteen (15) days of receipt of Landlord's notice, then the time for Landlord to cause such interruption or disturbance to cease in its entirety shall be deemed extended to the date set forth in Landlord's notice.

4.11    Landlord agrees that at all times there will be free and uninterrupted access for motor vehicles between the Main Street and the Common Areas on the BJ's Tract as shown upon the Site Plan, other than as provided in Sections 9.1 and 10.2 of this Lease.

ARTICLE V

Real Estate Taxes

5.1    Tenant shall pay the Real Estate Taxes (as hereinafter defined) allocable to the Demised Premises (determined as hereinafter provided) for each tax year included within the term of this Lease and pro rata portion thereof for the tax years partially included in the term at the commencement and expiration thereof. The Real Estate Taxes allocable to the Demised Premises for any tax year shall be the sum of (A) the Real Estate Taxes upon the Building for said tax year (excluding the land beneath the same) and (B) Tenant's Lot Share of the Real Estate Taxes for said tax year assessed upon the land included in the Lot and all improvements upon the Lot (exclusive of buildings). If either the Building or the Lot shall not be separately assessed, but shall be assessed jointly with other improvements or other land, an allocation shall be made to determine the Real Estate Taxes upon the Building and, if applicable, the Lot. Such allocation of taxes shall be made according to the assessors' records or written assessor's certifications, or in the absence thereof, by the decision of a majority of three appraisers, one designated by Landlord, one by Tenant and the third by the two so designated, the expenses of all such appraisers being borne by Tenant.

5.2    The term "Real Estate Taxes" shall mean real estate taxes for any tax year in such amounts as shall be finally assessed and determined to be ad valorem real estate taxes for said tax

year, that is, the real estate taxes assessed for said tax year less any abatements, refunds or rebates made thereof or any discounts available with respect thereto. If there shall be more than one taxing authority, the Real Estate Taxes for any period shall be the sum of the Real Estate Taxes for such period attributable to each taxing authority. Real estate taxes shall not include any income, excess profits, estate, inheritance, succession, transfer, franchise, capital or other tax or assessment upon Landlord, all of which shall be the obligation of Landlord. For the purpose of determining payments due from Tenant to Landlord in accordance with the provisions of this Article V: (A) the real estate taxes for any tax year shall be deemed to be the real estate taxes assessed for said tax year until such time as the same may be reduced by abatement, refund or rebate; and (B) if any abatement, refund or rebate shall be made for such tax year, the real estate taxes for said year shall be deemed to be the real estate taxes as so reduced plus the expenses of obtaining the reduction, and an appropriate adjustment shall be made in the amount payable from or paid by Tenant to Landlord on account of real estate taxes to be paid in that tax year or any other tax year following the determination of the amount of any such abatement, refund or rebate. Any rebates, refunds, or abatements of Real Estate Taxes received by Landlord subsequent to payment of taxes by Tenant shall be calculated in the same manner as taxes allocable to the Demised Premises and refunded to Tenant on a pro rata basis within thirty (30) days of receipt thereof. Landlord's failure to refund Tenant within thirty (30) days of receipt thereof shall be subject to interest charges calculated at the prevailing Prime Rate announced by The First National Bank of Boston (and if The First National Bank of Boston shall not longer be in operation, then the prime rate charged by the then largest commercial bank in Boston, Massachusetts) plus ▓ percent (▓ At Tenant's option, any such rebate, refund, or abatement realized by Landlord prior to payment by Tenant shall result in an immediate reduction in the Real Estate Taxes then due by Tenant to Landlord.

5.3   Landlord shall use its best efforts to cause the public authorities with the responsibility for the assessment of Real Estate Taxes to treat the BJ's Tract as a separate tax lot for such assessment purposes, in which event, notwithstanding the second sentence of Section 5.1, the Real Estate Taxes allocable to the Demised Premises shall be the sum of (A) the Real Estate Taxes upon the Building, plus (B) the Real Estate Taxes on the land included in the BJ's Tract.

5.4   Tenant shall have such rights to contest the validity or amount of any Real Estate Taxes as permitted by law, either in its own name or in the name of Landlord. Landlord shall cooperate with Tenant in any such contest and, in connection therewith, shall make available to Tenant such information in its files as Tenant may reasonably request. If any abatement, refund or rebate shall be obtained by either Landlord or Tenant, the reasonable expenses of obtaining the same shall be a first charge thereon. In any event, notwithstanding the foregoing, if any abatement by whomever prosecuted shall be obtained, the cost and expense of obtaining the same shall be a first charge upon said abatement. If Tenant shall file an application for abatement pursuant to the provisions of this Section 5.4, Tenant shall prosecute the same to final determination with due diligence and shall notify Landlord in writing immediately subsequent to Tenant receiving notification of the final determination. Tenant may discontinue the prosecution of the same at any time after giving Landlord notice thereof and an opportunity to take over the prosecution of the same. If Landlord shall file an application for abatement for any tax year, Landlord shall prosecute the same to final determination with due diligence and shall notify Tenant of the final determination immediately subsequent to Landlord's receiving notification of such final determination. Landlord may discontinue the prosecution of the same at any time after giving Tenant notice thereof and an opportunity to take over the prosecution of the same. If either party shall prosecute an application for an abatement, the other party shall cooperate in any

such contest, and in connection therewith, shall furnish any pertinent information in its files as may be reasonably requested.

5.5    Landlord shall submit to Tenant copies of the real estate tax bills for each tax year. Landlord shall bill Tenant for any amount that may be payable by Tenant pursuant to the provisions of this Article V. Said bill shall be accompanied by a computation of the amount payable. The amount payable by Tenant hereunder for any tax year shall be payable on or about the time that Landlord shall be required to pay real estate taxes to the taxing authority for said tax year without accrual of interest on a payment, but, if Tenant shall not have received a bill therefor together with such evidence of the cost and computation thereof as Tenant may request, at least fourteen (14) days prior to said time for payment by Landlord, then Tenant shall not be required to make such payment until fourteen days after the receipt of such bill and evidence. Any payment not timely made by Tenant shall be subject to interest charges at the interest rate described in Section 5.2 above. At any time before or after the making of such payments, Tenant shall have the right to audit or cause to be audited Landlord's computations, but such audit shall be limited to the three (3) prior tax years. If such audit fails to substantiate the amount of taxes imposed or to be imposed by Landlord on Tenant, then Tenant shall be entitled to a reduction or refund. At Tenant's election, any such refund shall be paid in cash to Tenant or credited by Tenant against future real estate tax obligations or all of its future obligations under this Lease. In the event Landlord disputes the results of an audit so conducted by Tenant, and so notifies Tenant by notice given within ten (10) days of receipt of a notice from Tenant demanding such reduction or reimbursement, then Landlord and Tenant shall each appoint an independent examiner with at least five (5) years experience in the real estate taxation of shopping centers within ten (10) days of Landlord's notice. If such examiners shall fail to agree within ten (10) days of their appointment, they shall together appoint a mutually acceptable third examiner with the same minimum qualifications. The third examiner shall issue the results of his examination within ten (10) days of his appointment and the results of such examination shall be binding on the parties. Each party shall bear the fees and expenses of the examiner appointed by such party and the parties shall share equally in the fees and expenses of the third examiner, if any shall be appointed.    Tenant shall pay the amount of Real Estate Taxes imposed by Landlord notwithstanding the pendency of any such audit, although such payment shall not waive Tenant's right to such refund upon completion of such audit. If Real Estate Taxes are payable to any taxing authority for any tax year in installments, the amount payable by Tenant hereunder shall be payable in similar installments. If Real Estate Taxes are payable to different taxing authorities for any tax year at different times, and appropriate apportionment shall be made of the amount payable by Tenant for said tax year and the apportioned amounts shall be payable at such times. Landlord agrees that Real Estate Taxes upon the Building and the Lot shall be paid by Landlord prior to the last day that the same may be paid without penalty or interest, or if a discount shall be available for early payment, prior to the last day that such discount shall be available. Without cost to Tenant, Landlord shall bear all interest, penalties, late charges and lost discount amounts incurred as a result of Landlord's failure to timely pay any installment of Real Estate Taxes, except to the extent such interest, penalties, late charges and lost discount amounts are due to Tenant's failure to comply with its obligations under this Section 5.5. Landlord shall furnish to Tenant copies of receipted tax bills showing payment in full of any real estate taxes in which Tenant is required to share pursuant to the terms hereof, promptly after Landlord shall have received such receipted tax bills.

ARTICLE VI

Common Areas

6.1     Tenant shall have the nonexclusive right, in common with other tenants of the Lot and their employees and invitees, to use the parking areas and facilities, driveways and delivery areas located on or in the Lot and as originally constructed as part of Landlord's Construction Work and subsequently modified as herein provided and permitted and the Pylon as located on the Site Plan and Landlord's right to use the parking areas and facilities, driveways, truckways and delivery areas located on the HD Tract to the extent permitted by the REA.  Tenant's rights to use the Pylon are more specifically set forth in Schedule B.  Except as otherwise permitted by the REA with respect to the HD Tract, no alterations shall be made in the Common Areas (other than for necessary repair and replacement of the same) nor shall the Common Areas be used other than for parking and access.  No buildings or structures other than cart corrals shall be located on the Lot other than as shown on the Site Plan.

Tenant, at all times, shall keep so much of the Common Areas as are located on the BJ's Tract in good repair and in the condition of other similar first-class strip centers in northern New Jersey, suitably paved and marked for parking and traffic flow, free of refuse and obstruction, property drained, free of snow and ice, and lighted substantially in accordance with the lighting plan dated August 12, 1996; last revised October 17, 1996 (McNally Engineering, PI) from 7:30 a.m. until full light of day and from dusk until 10:00 p.m. on Monday through Saturday and from dusk until 7:00 p.m. on Sunday, or such later time as may be required by law, and thereafter lit until dawn for security purposes at an intensity of not less than twenty-five (25%) of that shown on said plan or as in accordance with applicable law (the "Lighting Requirement"). Tenant shall make such changes to the Common Areas located on the BJ's Tract as may be required by applicable law enacted after the Commencement Date unless such compliance shall be excepted, excused or exempted due to the existence of such improvements prior to the enactment of such law or for any other reason.  Tenant shall have the right at Tenant's sole cost and expense to contest the application of such law to the Common Areas located on the BJ's Tract to final resolution in any court or governmental agency having jurisdiction.

Landlord agrees not to permit the Common Areas located on the Lot to be used for parking, access or any other purpose, by any owner, occupant, visitor or invitee of any property outside of the Shopping Center.

Subject to the costs to be paid by Tenant pursuant to Section 6.3 of this lease, there shall be no charge whatsoever levied for the use of any parking areas within the Common Areas.

6.2     Landlord, at all times, shall keep the Access Improvements, the Pylon and the portion of the Lot not included in the BJ's Tract in good repair and in the condition of other similar first-class strip centers in northern New Jersey, suitably paved and marked for parking and traffic flow, free of refuse and obstruction and free of snow and ice, properly drained and lighted in conformity to the Lighting Requirement set forth in Section 6.1 above, all in a manner suitable for use by Tenant and its invitees.  Landlord shall make such changes to the Access Improvements and the Common Areas not included in the BJ's Tract as may be required by applicable law enacted after the Commencement Date unless such compliance shall be excepted, excused or exempted due to the existence of such improvements prior to the enactment of such law or for any other reason.  Landlord shall have the right at Landlord's sole cost and expense to contest the application of such law to the Common Areas not included in the BJ's Tract to final

ID # 6577v08/8151-18
2/11/97

-16-

resolution in any court or governmental agency having jurisdiction and either Tenant or Landlord may so contest the application of such law to the Access Improvements.  In the event Landlord shall be so required to cause the Access Improvements to comply with such law, Tenant shall reimburse Landlord an amount equal to Tenant's SC Share of the reasonable cost of such compliance incurred by Landlord.

6.3     Provided Landlord shall comply with the requirements of Section 6.2, Tenant agrees to pay to Landlord as Tenant's agreed-upon share of the cost of maintaining and operating the Pylon and the Access Improvements during the term hereof an annual charge, as additional rent, equal to Tenant's SC Share (determined for the year in question) of such costs, along with a management fee equal to ▮▮▮▮▮ percent of such costs, provided that no such management fee shall be payable with respect to the portion of such costs which represent charges incurred by Landlord and passed through to tenants, including but not limited to, charges for utilities, taxes and insurance coverage.  Such costs shall be consistent with those costs in similar first class strip centers in northern New Jersey.  The costs in which Tenant is to share pursuant to this Section 6.3 shall include premiums for liability insurance maintained in respect of the Access Improvements, and the costs for on-site maintenance, but shall not include the following: (i) the cost of maintaining or repairing buildings on the Lot; (ii) capital expenses of any kind (which term shall include for the purposes hereof the cost of (a) repaving the Access Improvements as compared to patch-paving of the Access Improvements), (b) replacing light standards and fixtures as compared to repairing of light standards and fixtures (unless repair shall be more expensive than replacement), (c) purchasing new equipment as compared to repairing equipment currently in use (unless repair shall be more expensive than replacement); (iii) the cost of removing any trash created by the operation of any tenant or occupant of the Lot (but shall not exclude general litter in the Access Improvements); and (iv) any expense reimbursed by insurance or third parties.  Notwithstanding the provisions of subsection (ii) of the immediately preceding sentence, the capital expenses referred to therein which are incurred by Landlord after the tenth anniversary of the Commencement Date may be included in the costs in which Tenant is to share pursuant to this Section 6.3, provided however, that such capital expenses shall be amortized over the useful life of the capital item to which they relate. For the period beginning on the Commencement Date and ending on the last day of the calendar month immediately preceding the delivery by Landlord to Tenant of the first annual statement described in the next paragraph hereof, the foregoing charge shall be based upon an estimate of ▮▮▮▮▮▮▮ ▮▮▮▮▮ per square foot of Floor Area of the Building per annum and adjusted at the end of such period based on Landlord's actual cost therefore.  For subsequent periods the foregoing charge shall be based upon Landlord's actual charges for the most recent calendar year for which such charges have been determined, exclusive of any extraordinary charges applicable to such calendar year.  The foregoing charges shall be payable monthly in advance together with Base Rent.

Within ninety (90) days after the end of each calendar year during the term hereof, Landlord shall furnish to Tenant a statement in reasonable detail setting forth the computation of the foregoing total costs and expenses, and setting forth Tenant's SC Share thereof.  Landlord shall also furnish to Tenant, promptly after Tenant requests the same, back-up invoices, receipts and such other data as shall be necessary in order for Tenant to verify the amount of such costs and expenses.  Tenant shall, within thirty (30) days after receipt of Landlord's statement, pay to Landlord or Landlord shall reimburse Tenant, as applicable, the amount of any adjustment, to the end that Landlord shall be entitled to receive Tenant's SC Share and no more.  Tenant shall have the right to make any such payment "under protest", but the failure to do so shall not constitute a waiver of Tenant's rights under the next following paragraph of this Section 6.3.  A fair and equitable adjustment shall be made with respect to any such payments due from Tenant to

Landlord in connection with the last period of the term of this Lease, since the same may not coincide with the payment periods involved.

Tenant shall have the right to audit and inspect all of Landlord's records relating to the costs and expenses in which Tenant is required to share pursuant to this Section 6.3; provided, hereunder, such audit shall be limited to such costs and expenses for the three (3) prior calendar years.  Landlord shall make such records available to Tenant at Landlord's main offices at reasonable times.  Appropriate adjustments shall be made for error in the amount of such computations revealed by such audit or inspection.  If any such audit or inspection by Tenant indicates an overcharge in the amount of Tenant's Lot Share of such costs and expenses by more than ███████████████████ the reasonable costs of such audit or inspection shall be paid on demand to Tenant by Landlord; otherwise, the expenses of Tenant's audit or inspection shall be borne by Tenant.  If there has been an overcharge and a resulting overpayment by Tenant, such amount shall promptly be reimbursed by Landlord to Tenant; and if such reimbursement does not occur within thirty (30) days after Landlord has been given notice of the overcharge established by such audit or inspection, then Tenant shall have the right to offset the amount of such overcharge from rent and other charges thereafter accruing until, in such fashion, such overcharge shall have been recovered in full.

6.4     Landlord agrees that (a) it shall not amend the REA or permit amendment to the REA to permit the use of the Shopping Center or any portion thereof in a manner contrary to the provisions of Article XVI of this Lease, and (b) it shall cooperate with Tenant to permit Tenant to receive notices given pursuant to the REA.

## ARTICLE VII

### Tenant's Repairs; Landlord's Repairs; Landlord's
### Maintenance of the Shopping Center; Special Repairs

7.1     Subject to Landlord's obligation under this Article VII, Tenant shall maintain the Building, including without limitation, all glass and all utility conduits, fixtures and equipment within the Building serving the Demised Premises exclusively which may be necessary to maintain the same, in good repair and condition as the same are in on the Commencement Date or as may be required by any laws, ordinances or regulations of any public authorities having jurisdiction, reasonable wear and tear and damage by the events described in Article IX excepted and subject to Article X of this Lease.  Such maintenance shall include cleaning gutters and downspouts, removing debris from the roof and routine caulking and cosmetic painting of the exterior of the Building, if necessary.  From and after the twentieth (20th) anniversary of the Commencement Date, Tenant shall also maintain the roof, the slab floors, the exterior walls, the roof drainage system, the Service Areas (defined in Schedule B) and the structural parts of the Building in good repair and condition as the same are in on such anniversary or as may be required by any laws, ordinances or regulations of any public authorities having jurisdiction, reasonable wear and tear and damage by the events described in Article IX excepted and subject to Article X of this Lease.  Upon the expiration or other termination of the term of this Lease, Tenant shall remove its personal property and the personal property of all persons claiming under Tenant and shall yield up peaceably to Landlord the Demised Premises with so much of the same as Tenant is obligated to maintain pursuant to the provisions of this Section 7.1.

7.2     In addition to Landlord's obligations under Section 6.2 and Section 7.4 of this Lease, Landlord shall maintain until the twentieth (20th) anniversary of the Commencement Date the roof, the slab floors, the exterior walls (including, without limitation, the repointing of mortar

if necessary), the roof drainage system, the Service Areas (defined in Schedule B) and the structural parts of the Building in good repair and condition as the same are in on such anniversary or as may be required by any laws, ordinances or regulations of any public authorities having jurisdiction, reasonable wear and tear and damage by the events described in Article IX excepted and subject to Article X of this Lease. Landlord shall also maintain until the twentieth (20th) anniversary of the Commencement Date, to the extent located within or beneath slab-floors of the Building and not readily accessible by means of removable panels, access doors or the like, the structural integrity of all wiring, plumbing, pipes, conduits and other utilities and sprinkler fixtures, the Common Areas and the Pylon and, to the extent not included in the foregoing, all utility conduits, fixtures and equipment serving the Demised Premises which serve other premises or are located within the Shopping Center (but not the Demised Premises), as may be necessary to maintain the same in good repair and condition or as may be required by any laws, ordinances or regulations of any public authorities having jurisdiction in effect on the Commencement Date.  However, notwithstanding anything in this Lease contained to the contrary, Tenant, not Landlord, shall make all repairs, replacements and alterations to the property which Landlord is required to maintain which may be required as the result of repairs, replacements, alterations, other improvements or installations made by Tenant or any subtenant or concessionaire of Tenant or the agents of any of them, unless done by Tenant pursuant to Section 9.1 or Section 13.2, or which may be required as a result of Tenant overloading the slab floors within the Building, but only if and to the extent such slab floors were constructed in accordance with the Final Details.  In addition, Landlord shall make any repairs to the property Tenant is required to maintain which are required as a result of a failure of repair of the property Landlord is required to maintain.

7.3    Landlord shall also maintain the improvements located on the portion of the Lot not included in the BJ's Tract, including without limitation, all glass and facades of the buildings therein, in good repair and condition or in such greater condition as may be required by any laws, ordinances or regulations of any public authorities having jurisdiction, reasonable wear and tear excepted.

7.4    Notwithstanding anything in Section 7.1 contained to the contrary, Landlord shall make all repairs or alterations that shall be required (a) during the first five (5) years following the Commencement Date as a result of (i) movement of the Demised Premises such as settling, or as the result of settling of the Service Areas or the Common Areas (other than pot holes), or (ii) Landlord's failure to construct the Demised Premises, the Service Areas or the Common Areas as required by the Final Details, (b) during the first twelve (12) months following the Commencement Date as a result of defective materials or workmanship in the construction of the Demised Premises, the Service Areas or the Common Areas, and (c) during the first five (5) years following the Commencement Date to the compressor within the HVAC system.  Landlord agrees that Landlord shall give to Tenant the benefit of all guarantees Landlord may have from its contractors or materialmen or is required by Schedule C to have therefrom and that Tenant may enforce such guarantees either in Tenant's name or in Landlord's name.

ARTICLE VIII

Alterations

8.1    Tenant agrees that any repairs, replacements, alterations, other improvements or installations made by Tenant to or upon the Demised Premises shall be done in a good and workmanlike manner and in conformity with all laws, ordinances and regulations of all public authorities having jurisdiction, that materials of good quality shall be employed therein, that the

structure of the Demised Premises shall not be endangered or impaired thereby. Tenant will make no alterations to the structural elements of the Building or to the exterior of the Building at any time during the term of this Lease without Landlord's approval, which approval shall not be unreasonably withheld or delayed, provided that no such approval shall be required so long as such exterior alterations shall cause the Building to appear similar to the majority of Tenant's other locations in New Jersey. Such alteration to the exterior of the Building shall be deemed approved if Landlord shall not object in writing to Tenant within fifteen (15) days of receipt by Landlord of plans or a reasonably detailed description of Tenant's proposed alteration. Tenant shall give Landlord advance notice of interior structural alterations to the Building and alterations to exterior mechanical systems, and promptly upon completion thereof, shall transmit to Landlord as-built plans showing the same. All salvage in connection with any work done by Tenant pursuant to provisions of this Article may be disposed of by Tenant. It is agreed and understood that Landlord will accept the Demised Premises as altered pursuant to the provisions hereof without any obligation upon Tenant to restore the Demised Premises to their former condition unless Landlord in the exercise of reasonable discretion, as aforesaid, shall have conditioned its approval (as to alterations which require Landlord's approval) on the removal of such alteration at the expiration or earlier termination of the term of this Lease.

8.2   To the extent permitted under applicable laws, ordinances and regulations of public authorities having jurisdiction, Landlord agrees that Tenant may erect and maintain its usual signs, from time to time, upon the Building and the Pylon within the areas so designated on the plans and specifications hereinafter described. Such signs and their locations shall initially be as shown upon the plans and specifications referred to in Schedule C and, as to the Pylon, as shown on Schedule B-1, and any changes to the signs of the original Tenant shall be consistent with the signs at a majority of Tenant's other locations operating under the same trade name in northern New Jersey. Subtenants operating stores which are part of a national or regional chain of stores may place their usual signs, and other subtenants may place signs approved by Landlord (which approval shall not be unreasonably withheld) from time to time, on the Building and the Pylon in the locations shown in said plans and specifications which signs shall not together with Tenant's signs, in the aggregate, exceed the area shown in said plans and specifications. The signs to be erected on the Pylon shall not exceed seven (7) feet x seven (7) feet measured on each side. Tenant's sign on the Pylon shall be no smaller than any other sign on the Pylon, and shall occupy the second-highest panel, provided that if the occupant of the HD Tract shall not place a sign on the topmost panel, Tenant shall be entitled to do so in lieu of a sign on the second-highest panel. Landlord agrees to use commercially reasonable efforts to cause the occupant of the HD Tract to permit Tenant to occupy the topmost panel. If Tenant obtains the consent of the occupant of the HD Tract, Tenant may place an identification sign on Pylon No. 2 shown on the Site Plan. Landlord further agrees that Tenant and subtenants may erect and maintain upon the roof of the Building antennae for electronic receivers and transmitters in the Building and that Tenant and subtenants may maintain upon the roof and on the adjacent ground utilities equipment serving the Demised Premises as shown in said plans and specifications or as may be subsequent approved by Landlord, which approval shall not be unreasonably withheld. Tenant or subtenants, as may be applicable, shall be responsible for such signs, antennae and equipment. Any antenna shall not impair the integrity of the roof of the Building, shall be screened in a manner which shall shield its visibility from all portions of the Common Area, shall conform to all applicable codes and shall not interfere with transmission or reception by any other occupant of the Shopping Center. Nothing in this Section 8.2 shall be construed to allow Tenant to permanently obstruct the Common Areas in any manner which would impede the free flow of vehicular or pedestrian traffic thereon or which would cause any substantial safety hazard therein.

ID # 6577v08/8151-18
2/11/97

8.3    All repairs, alterations, other improvements or installations made to or upon the Demised Premises which are so attached to the realty that the same will be by law deemed to be part of the realty shall (subject, however, to the provisions of Section 8.1 and the provisions of the following sentence) be the property of Landlord and remain upon and be surrendered with the Demised Premises as a part of this Lease.   Notwithstanding the foregoing, all trade fixtures, (including without limitation, automobile lifts, compressors, generators and hydraulic equipment), (other than ducts), and signs, whether by law deemed to be a part of the realty or not, installed at any time or times by Tenant or anyone claiming under Tenant (at Tenant sole cost and expense without any contribution from or reimbursement by Landlord and which are not replacements of property installed by Landlord) shall remain the property of Tenant or persons claiming under Tenant and may be removed by Tenant or any person claiming under Tenant at any time or times during the term of this Lease or any occupancy by Tenant thereafter, Tenant agreeing to repair any and all damage to the Demised Premises occasioned by the removal by Tenant or any person claiming under Tenant of any property from the Demised Premises.

8.4    Tenant shall procure all necessary permits before making any repairs, alterations, other improvements or installations to or upon the Demised Premises, including without limitation, signs.   Landlord shall cooperate with Tenant in obtaining such permits, including without limitation, sign permits.   To the extent plans are required to be filed with any applications for any such permits, Tenant shall furnish copies of the same to Landlord.   The submission of such plans shall not, however, be construed as requiring the approval or consent of Landlord to either the plans or the filing of the same with appropriate governmental authorities, or as otherwise required hereunder.   Tenant agrees to save harmless and indemnify Landlord from any and all injury, loss, claims or damage to any person or property occasioned by or arising out of the doing of any such work by Tenant.

8.5    Tenant shall permit no mechanic's, materialman's or other lien against the Demised Premises or property of which the Demised Premises are a part in connection with any materials, labor or equipment furnished, or claimed to have been furnished, to or for Tenant, and if any such lien shall be filed against the Demised Premises or property of which the Demised Premises are a part Tenant shall cause the same to be discharged, provided, however, that if Tenant desires to contest any such lien it may do so as long as the enforcement thereof is stayed, but in any event, Tenant shall either cause any such lien to be discharged of record within ten days of any written request of any mortgagee, or Landlord because of any requirements of any mortgagee or prospective mortgagee, or in lieu thereof, while contesting the same as aforesaid, deposit with the mortgagee or prospective mortgagee, pending such contest, a sum or bond sufficient to cover the amount of said lien and all interest, penalties or costs that would be payable to discharge such lien if such lien were valid.

8.6    Landlord shall permit no mechanic's, materialman's or other lien against the Demised Premises or property of which the Demised Premises are a part in connection with any materials, labor or equipment furnished, or claimed to have been furnished, to or for Landlord or any other occupant of property of which the Demised Premises are a part, and if any such lien shall be filed against the Demised Premises or property of which the Demised Premises are a part Landlord shall cause the same to be discharged, provided, however, that if Landlord desires to contest any such lien it may do so as long as the enforcement thereof is stayed.

ARTICLE IX

Fire and Other Casualty

9.1   (A) If the Building or Service Areas or any part thereof shall be damaged or destroyed by fire, the elements or other casualty during the term of this Lease, then, Tenant shall give prompt notice thereof to Landlord, and, except as provided in Section 9.2 hereof, Tenant shall, promptly thereafter, repair or restore the Building to substantially the same condition they were in immediately prior to the casualty.  All insurance proceeds recovered on account of any damage or destruction to the Building by fire, the elements or other casualty shall be made available for the payment of the cost of the aforesaid repair or restoration.  If the amount of said

███████████████████████████████████████████████████████████████████████████

be deposited in escrow with instructions to the escrow holder that the escrow holder shall disburse the same to Tenant as the work of repair or restoration progresses upon certificates of the architect or engineer administering the repair or restoration that the disbursements then requested, plus all previous disbursements made from said insurance proceeds, do not exceed the cost of the repair or restoration already completed and paid for, and that the balance in the escrow fund plus the amount of any so-called deductible applicable thereto is sufficient to pay for the estimated cost of completing the repair and restoration.  The escrow holder shall be the institutional lender holding a first mortgage upon the Demised Premises or the property of which the Demised Premises are a part if such institutional lender shall be willing to accept said escrow; otherwise the escrow holder shall be any bank mutually agreeable to Landlord and Tenant.  If the insurance proceeds shall be less than the cost of repair or restoration, Tenant shall pay the excess cost.  If the insurance proceeds shall be greater than the cost of repair or restoration, the excess shall belong to Tenant, and shall be disbursed to Tenant upon receipt by the escrow holder of a certificate of said architect or engineer that the repair or restoration is complete.

(B) If the Common Areas located on the BJ's Tract shall be damaged or destroyed by fire, the elements or other casualty, then, except as hereinafter otherwise provided, Tenant, shall, promptly thereafter, repair or restore such Common Areas to substantially the same condition they were in immediately prior to such casualty.  Landlord shall so repair or restore the Access Improvements and the Common Areas located on the portion of the Lot not included in the BJ's Tract, but Landlord shall have no obligation to so repair or restore the Common Areas located on the HD Tract, provided that the Access Improvements and the Pylon are maintained in good repair and condition.  If the damage to the Access Improvements shall deprive Tenant and its customers of all vehicular access to the Demised Premises for a period longer than three (3) consecutive days, then rent and all other amounts payable by Tenant pursuant to this Lease shall be abated in their entirety or to the extent such abatement is not covered by rent insurance commencing with the expiration of said three (3) day period, or if after such three (3) day period, the damage to the Access Improvements shall deprive Tenant and its customers of one-half or more (but less than all) of the vehicular access to the Demised Premises, then the rent and all other amounts payable by Tenant pursuant to this Lease shall abate by one-half, or to the extent such abatement is not covered by rent insurance in each case until the day after the Access Improvements shall be repaired or restored to substantially the same condition they were in immediately prior to such casualty or if earlier, the date on which Tenant opens for business; rent and any such other amounts paid in advance for a period beyond the date three (3) consecutive days after the day on which all or a portion greater than one-half of such vehicular access was so impaired shall be apportioned and adjusted according to this Section.  All insurance proceeds or

damages recovered on account of any damage or destruction of the Access Improvements or the Common Areas caused by fire, the elements, the act of any public authority or any other casualty shall be made available to the party required to repair or restore the damaged or destroyed improvements for the payment of the cost of such repair and restoration.

9.2    It is agreed and understood that if during the last two (2) years of the term of this Lease, the Building shall be so damaged or destroyed to the extent of     percent    or more of its insurable value, either Landlord or Tenant may, if either shall so elect, terminate the term of this Lease by notice to the other within twenty (20) days after such damage or destruction. If Landlord shall give such notice of termination at a time when Tenant shall have the right to elect to extend the term of this Lease, and if within fifteen (15) days after Tenant shall receive such notice of termination from Landlord, Tenant shall exercise such election, then such notice of termination shall become void and of no force or effect, and Tenant shall restore the Demised Premises as set forth in Section 9.1(A). In the event of any termination of the term of this Lease pursuant to the provisions of this Section 9.2, the termination shall become effective on the twentieth day after the giving of the notice of termination, neither Landlord nor Tenant shall be obligated to repair or restore any damage or destruction caused by the fire or other casualty, and said insurance proceeds shall belong to Landlord.

9.3    Tenant shall maintain at all times during the term of this Lease with respect to the Building, all risk insurance, insurance against loss or damage by fire, the so-called extended coverage casualties, vandalism and malicious mischief and sprinkler leakage (if there shall be a sprinkler system). Tenant may, at its election, maintain insurance with respect to additional casualties and events. Said insurance shall be in an amount not less than one hundred percent (100%) of the full replacement cost of the Building, and said insurance may be written with so-called ninety percent (90%) co-insurance clause, and in such event sufficient insurance shall be carried so that the insured shall not be a co-insurer. Said insurance may be written with Tenant's standard so-called "deductible", from time to time. In addition, Tenant shall maintain rent loss insurance sufficient to cover the Base Rent and any additional charges payable by Tenant under this Lease for a one year period. Insurance against any or all of such risks may be maintained under a blanket policy covering the Demised Premises and other real estate of Tenant and/or its affiliated business organizations. Nothing herein contained, however, shall affect the obligation of Tenant set forth in Section 9.1 to repair or restore the Building. The policies of such insurance shall name Tenant as insured and Landlord and the holder of the first mortgage encumbering the property of which the Demised Premises are a part as additional insureds, as their interest may appear, and, subject to the provisions of said Section 9.1, shall be payable in case of loss to holders of any mortgages upon the property of which the Demised Premises are a part, as their interest may appear. Such policies of insurance shall provide that no act or omission of any person named as insured thereunder shall invalidate the interest of, or be a defense against, any other person named as insured thereunder. Tenant shall have the right to adjust with the insurance carriers the amount of the loss upon such policies. Said insurance shall be written by responsible insurance companies authorized to do business in the state wherein the Demised Premises are located with a Best's rating of A-/VII or better. Tenant agrees that not less than ten (10) days prior to the Commencement Date and no less than ten (10) days prior to the expiration of each policy of such insurance, Tenant shall deliver to Landlord certificates of such insurance, or the renewals thereof, as the case may be. If the terms of any policies of such insurance shall expire after the termination of the term of this Lease, then said policies (other than blanket policies) shall be endorsed to release the interest of Tenant therein as of the time of such termination and a pro rata adjustment in the premiums shall be made between Landlord and Tenant.

ID # 6577v08/8151-18
2/11/97

9.4     In the event of a casualty resulting from war, civil commotion, nuclear explosion, flood, earthquake or other risks then customarily excluded from so-called "All Risk" coverage for which Tenant is not required under Section 9.3 to carry insurance, Tenant shall have the right to continue in use and occupancy of the Demised Premises beyond the end of the term of this Lease without payment of Base Rent for that number of days which when multiplied by the per diem Base Rent (at the rate prevailing at the expiration of the term) shall equal the amount expended by Tenant pursuant to Section 9.1 to repair and restore damage by such casualty.

## ARTICLE X

## Condemnation

10.1     If after the execution of this Lease and prior to the expiration of the term of this Lease the whole of the Demised Premises shall be appropriated by right of eminent domain, then the term of this Lease shall cease as of the time of such appropriation, and rent and all other payments under this Lease shall be apportioned and adjusted as of the time of termination. Tenant shall have the right at its election to continue to occupy the Demised Premises, to the extent permitted by law, for all, or such part, as Tenant may elect, of the period between the time of such appropriation and the time when physical possession of the Demised Premises shall be taken, subject to the provisions of this Lease insofar as the same may be made applicable to such occupancy by Tenant, but the amount, if any, charged to Tenant by the authority or its assigns for rent or use and occupancy shall be deductible from the rent paid or payable by Tenant hereunder.

10.2     If by right of eminent domain or any other action of any public authority:

(i)     a part of the Building shall be appropriated and if as a result thereof (and all previous takings) the ground floor area of the Building shall be reduced to less than ninety percent (90%) of the ground floor area thereof set forth in Schedule B of this Lease, or

(ii)     a part of the Common Areas shall be appropriated and if as a result thereof (and all previous takings) the Common Areas located on the BJ's Tract shall be reduced in size by twenty percent (20%) or more, or

(iii)     the Common Areas located on the BJ's Tract and the Access Improvements shall cease to have a reasonable access for pedestrians and motor vehicles to and from the Main Street, or

(iv)     there shall cease to be reasonable access for pedestrians between the Common Areas located on the BJ's Tract and the Building consistent with the original Tenant's other locations in northern New Jersey then in existence, if any, or

(v)     there shall cease to be reasonable access for trucks to and from the service door(s) of the Building consistent with the original Tenant's other locations in northern New Jersey then in existence, if any, or

(vi)     any part of the Demised Premises shall be appropriated during the last two (2) years of the term of this Lease,

then Tenant may, if Tenant shall so elect, terminate the term of this Lease by giving Landlord notice of the exercise of such election within twenty (20) days after the receipt by Tenant of

notice from Landlord of such appropriation. If by right of eminent domain any part of the Demised Premises shall be appropriated during the last two (2) years of the term of this Lease, then Landlord may, if Landlord shall so elect, terminate the term of this Lease by giving Tenant notice of the exercise of such election within twenty (20) days after the receipt by Landlord of notice of such appropriation. If Landlord shall give such notice of termination at a time when Tenant shall have the right to exercise an election to extend the term of this Lease, and if within fifteen (15) days after Tenant shall receive such notice of termination from Landlord, Tenant shall exercise said election, then such notice of termination shall become void and of no force or effect.

In the event of a termination under the provisions of this Section, the termination shall be effective as of the time that physical possession of the premises so appropriated shall be taken, and rent and all other payments pursuant to this Lease shall be apportioned and adjusted as of the time of termination, but the amount charged by the taking authority or its assigns for rent or use and occupancy between the time of appropriation and the time of termination shall be deductible from rent paid or payable hereunder. If there shall be an appropriation by right of eminent domain and if the term of this Lease shall not be terminated as aforesaid, then the term of this Lease shall continue in full force and effect and Landlord shall, within a reasonable time after physical possession is taken of the premises appropriated, restore what may remain of the Building or the Common Areas located on the BJ's Tract or the Access Improvements, as the case may be, and as the same may be attended thereby to substantially the same condition they were in prior thereto, subject to reduction in size thereof. A just proportion of the rent and all other amounts payable by Tenant pursuant to this Lease, shall be suspended or abated until the later of (a) the day after what may remain of the Demised Premises shall be restored, as aforesaid, or (b) thirty (30) days have expired after notice from Landlord to Tenant that Tenant may enter the Demised Premises to reinstall its fixtures and merchandise and setting forth the date, not less than thirty (30) days after such notice, that the Demised Premises shall be so restored, or such earlier time as Tenant may at its election open for business and thereafter a just proportion of the rent and such other amounts, according to the nature and extent of the part of the Demised Premises so appropriated, shall be suspended or abated for the balance of the term of this Lease. In the event of an appropriation of a portion of the Access Improvements which deprives Tenant and its customers of vehicular access to and from the Main Street, rent and other amounts shall be abated as follows: If the appropriation of the Access Improvements shall permanently deprive Tenant and its customers of all vehicular access to the Demised Premises, then rent and all other amounts payable by Tenant pursuant to this Lease shall be abated in their entirety, or (b) if the appropriation of the Access Improvements shall permanently deprive Tenant and its customers of one-half or more (but less than all) of the vehicular access to the Demised Premises, then the rent and all other amounts payable by Tenant pursuant to this Lease shall abate by one-half, in each case until the day after the Access Improvements shall be repaired or restored (if such repair or restoration shall occur) to substantially the same capacity they were in immediately prior to such appropriation.

10.3   Landlord reserves to itself, and Tenant assigns to Landlord, all rights to damages accruing on account of any appropriation by eminent domain or by reason of any act of any public authority for which damages are payable. Tenant agrees to execute such instruments of assignment as may be reasonably requested by Landlord in any petition for the recovery of such damages if requested by Landlord, and to turn over to Landlord any damages that may be recovered in any such proceeding. It is agreed and understood, however, that Landlord does not reserve to itself and Tenant does not assign to Landlord, any damages payable for trade fixtures or other improvements installed by Tenant or any person claiming under Tenant at the sole cost and expense of Tenant or such other person, or any damages which are considered "special

ID # 6577v08/8151-18
2/11/97

damages" to Tenant, it being understood and agreed that the term "special damages" as used in this sentence shall not be construed to include any damage to Tenant arising solely from Tenant's loss of its leasehold interest herein as the result of any appropriation by eminent domain or any act of any public authority for which damages are payable; provided, however that any such damages payable to Tenant therefore be specifically designated as such by the condemning authority, and that such designation shall not reduce or otherwise adversely affect Landlord's award.

## ARTICLE XI

### Indemnification

11.1    To the extent permitted by law, Tenant shall save Landlord harmless from, and defend and indemnify Landlord against, any and all injury, loss or damage (excluding, however, consequential damage) or claims for injury, loss or damage, of whatever nature, to any person or property caused by or resulting from any act, omission or negligence of Tenant or any subtenant or concessionaire of Tenant or any employee or agent of Tenant or any subtenant or concessionaire of Tenant, including without limitation, reasonable attorneys' fees.  It is a condition of this save harmless and indemnification that Tenant shall receive prompt notice of any such claim by Landlord.

11.2    To the extent permitted by law, Landlord shall save Tenant harmless from, and defend and indemnify Tenant against, any and all injury, loss or damage (excluding, however, consequential damage) or claims for injury, loss or damage, of whatever nature, to any person or property caused by or resulting from any act, omission or negligence of Landlord or its employees or agents, including without limitation, reasonable attorney's fees.  It is a condition of this save harmless and indemnification that Landlord shall receive prompt notice of any such claim by Tenant.

11.3    The provisions of this Article XI shall be subject to the provisions of Section 14.1 below.

11.4    If the aggregate net worth of Tenant and business organizations affiliated with Tenant (as determined by generally accepted accounting principles) is then less than ████████████ Tenant shall give Landlord notice to that effect, and, upon Landlord's request, ████████████████████████████████████████████████████████████████████████

Said insurance may be written with Tenant's standard so-called "deductible", from time to time, and may be maintained under a blanket policy covering the Demised Premises and other business operations of Tenant and/or its affiliated business organizations.  If and when Tenant shall so maintain a policy of comprehensive general liability insurance with respect to the Demised Premises, then in such event Tenant shall, upon request (a) deliver certificates of such insurance to Landlord and give Landlord not less than ten (10) days notice of cancellation or expiration thereof, and (b) pay the amount of any so-called deductible applicable to any claim under such policy involving Landlord and Tenant.  If Tenant is required to maintain such policy hereunder and fails to do so, then in addition to all other remedies of Landlord, Landlord may upon five (5) days' notice to Tenant, without cure by Tenant, obtain such policy, and Tenant shall promptly reimburse Landlord for the cost thereof.

D # 6577v08/8151-18
2/11/97

-26-

## ARTICLE XII

### Default

12.1   If Tenant shall default in the payment of rent or any other sum of money payable by Tenant to Landlord and if Tenant shall fail to cure such default within five (5) days after receipt of notice of such default from Landlord, without waiving any claim for breach of agreement, Landlord may send notice to Tenant of the termination of the term of this Lease and on the fifth day next following the date of the sending of such notice, the term of this Lease shall terminate, Tenant hereby waiving all rights of redemption.

12.2   In case of any such termination, Tenant will indemnify Landlord, each month, against all loss of rent and other payments provided herein to be paid by Tenant to Landlord between the time of termination and the expiration of the term of this Lease.  It is understood and agreed that at the time of the termination or at any time thereafter Landlord may rent the Demised Premises, and for a term which may expire after the expiration of the term of this Lease, without releasing Tenant from any liability whatsoever, that Tenant shall be liable for any expenses incurred by Landlord in connection with obtaining possession of the Demised Premises and in connection with any reletting, including, without limitation, reasonable attorneys' fees and reasonable brokers' fees, and that any monies collected from any reletting shall be applied first to the foregoing expenses and then to payment of rent and all other payments due from Tenant to Landlord; in no event, however, shall Tenant ever be liable or responsible for consequential, special or indirect, damages.

12.3   After any permitted assignment of Tenant's interest in this Lease, Landlord shall not exercise any rights or remedies under this Article XII on account of any default in payment of any rent or other sum of money unless Landlord shall give notice to the tenant named herein, as well as the tenant in possession, of such default and the opportunity to cure each such default within the period of time after such notice provided in Section 12.1 of this Lease.  After such notice, if the term of this Lease shall be terminated pursuant to the provisions of this Article XII, then Waban Inc. as tenant named herein shall not be liable for the payment of any rent or for the performance or observance of any agreements or conditions to be performed or observed after the date of such termination unless about the time of such termination Landlord shall have offered to the tenant named herein a lease for the balance of the term of this Lease upon the provisions of this Lease contained.

12.4   Landlord shall not have any lien, for the performance of any obligations of Tenant, upon any fixtures, machinery, equipment, or goods, wares or merchandise or other personal property, and Landlord hereby expressly waives the provisions of any law giving to Landlord such a lien.

12.5   If any person to whom Tenant shall not then be paying rent under this Lease shall demand payment of rent from Tenant, or any other amount payable by Tenant under this Lease, alleging his or its right to receive such rent or other amount as a result of a transfer of Landlord's interest in this Lease or otherwise, Tenant shall not be obligated to honor such demand unless Tenant shall receive written instructions to do so from the person to whom Tenant shall then be

paying rent or shall otherwise receive evidence reasonably satisfactory to Tenant of the right of the person making the demand. The withholding of rent, or any other amount payable by Tenant under this Lease, by Tenant pending the determination of the right of the party making the demand shall not be deemed to be a default on the part of Tenant as long as Tenant makes payment of the amounts due to an escrow agent satisfactory to Tenant and the persons claiming rent hereunder, to be held and disbursed by such escrow agent as such time as a final and binding determination is made relative to the party entitled to such payments.

## ARTICLE XIII

### Self-Help

13.1    If Tenant shall default in the performance or observance of any agreement or condition in this Lease contained on its part to be performed or observed other than an obligation to pay money, and shall not cure such default within thirty (30) days after notice from Landlord specifying the default (or if such default cannot reasonably be cured within such thirty-day period, then shall not within said thirty-day period commence to cure such default and thereafter diligently prosecute the curing of such default to completion, Landlord may, at any time thereafter cure such default for the account of Tenant, and any amount paid or any contractual liability incurred by Landlord in so doing shall be deemed paid or incurred for the account of Tenant, and Tenant agrees to reimburse Landlord therefor upon demand; provided that Landlord may, without waiving any claim for damages on account of such breach, cure any such default as aforesaid prior to the expiration of said thirty-day period but after notice to Tenant, if the curing of such default prior to the expiration of said thirty-day period is reasonably necessary to protect the real estate or Landlord's interest therein, or to prevent injury or damage to persons or property. If Tenant shall fail to reimburse Landlord upon demand for any amount paid for the account of Tenant hereunder, said amount together with interest thereon as provided in Section 13.2 below shall be added to and become due as part of the next payment of rent due hereunder.

13.2    If Landlord shall default in the performance or observance of any agreement or condition in this Lease contained on its part to be performed or observed, or shall default in the payment of any tax or other charge which shall be a lien upon the Demised Premises or in the payment of any installment of principal or interest upon any mortgage which shall be prior in lien to the lien of this Lease, and if Landlord shall not cure such default within thirty (30) days after notice from Tenant specifying and default, (or if such default cannot reasonably be cured within such thirty-day period, then shall not within said thirty-day period commence to cure such default and thereafter diligently prosecute the curing of such default to completion, Tenant may, at its option, without waiving any claim for damages for breach of agreement or the right to exercise any other remedy on account thereof, at any time thereafter cure such default for the account of Landlord (which cure may include, if Tenant so determines, taking action in the name of or on behalf of Landlord and Landlord does hereby authorize Tenant so to take such action), and any amount paid or any contractual liability incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord and Landlord agrees to reimburse Tenant therefor upon demand; provided that Tenant may cure any such default as aforesaid prior to the expiration of said thirty-day period, but after said notice to Landlord, if the curing of such default prior to the expiration of said thirty-day period is reasonably necessary to protect the Demised Premises or Tenant's interest therein or to prevent injury or damage to persons or property or to permit Tenant to conduct its usual business operations in the Demised Premises. If Landlord shall fail to reimburse Tenant upon demand for any amount paid for the account of Landlord hereunder, said amount, together with interest thereon at the annual rate of ▇▇ percent ▇▇ over the so-called prime rate of interest charged by The First National Bank of Boston (and if The First

National Bank of Boston shall not longer be in operation, then the prime rate charged by the then largest commercial bank in Boston, Massachusetts)may be deducted by Tenant from the next or any succeeding payments of rent due hereunder or any other amounts due from Tenant to Landlord, provided, however, that the amount of any such deduction shall be reduced by the lesser of (a) ▮▮▮▮▮▮ percent of the monthly Base Rent which would otherwise have been payable by Tenant for the month in which the deduction is made, or (b) the sum of (i) Tenant's Lot Share of the debt service payable by Landlord for the month in which the deduction is made to any institutional lender holding a first mortgage lien upon the Lot and (ii) the Real Estate taxes allocable to the Demised Premises for such month. The amount of such reduction shall be carried forward from month to month, and deducted from succeeding payments of rent and other amounts due hereunder as soon as is possible. Notwithstanding the foregoing, no such reduction in the amount deducted need be made by Tenant near the end of the Term hereof if such reduction would result in the Tenant not being fully reimbursed at the time of expiration of the term.

## ARTICLE XIV

### Waiver of Subrogation

14.1   Each of Landlord and Tenant hereby releases the other to the extent of its insurance coverage, from any and all liability for any loss or damage caused by fire or any of the extended coverage casualties or any other casualty shall be brought about by the fault or negligence of the other party, or any persons claiming under such other party, provided, however, this release shall be in force and effect only with respect to loss or damage occurring during such time as the releasor's policies of fire and extended coverage insurance shall contain a clause to the effect that this release shall not affect such policies or the right of the releasor to recover thereunder. Each of Landlord and Tenant agrees that its fire and extended coverage insurance policies shall include such a clause so long as the same is obtainable and is includable without extra cost, or if such extra cost is chargeable therefor, so long as the other party pays such extra cost. If extra cost is chargeable therefor, each party will advise the other thereof and of the amount thereof, and the other party, at its election, may pay the same but shall not be obligated to do so.

14.2   Except as provided in Section 14.1, neither Section 17.9 of this Lease nor anything else in this Lease contained shall be deemed to release either party hereto from liability for damages resulting from the fault or negligence of said party or its agents or from responsibility for repairs necessitated thereby or by any default thereof hereunder.

ARTICLE XV

Mortgage Subordination;
Nondisturbance of Subtenants

15.1    Tenant shall, upon the request of Landlord, in writing, subordinate this Lease and the lien hereof from time to time to the lien of any future first mortgage to a bank, insurance company or similar financial institution, irrespective of the time of execution or time of recording of such mortgage or mortgages, provided the holder of such mortgage shall enter into an agreement with Tenant, in recordable form, that in the event of foreclosure or other right asserted under the mortgage by the holder or any assignee thereof, this Lease and the rights of Tenant hereunder shall continue in full force and effect and shall not be terminated or disturbed except in accordance with the provisions of this Lease.  Tenant shall, if requested by the holder of any such mortgage, be a party to said agreement, and shall agree in substance that if the mortgagee or any person claiming under such mortgage shall succeed to the interest of Landlord in this Lease, Tenant shall recognize such mortgagee or person as its landlord under the terms of this Lease.  Tenant agrees that Tenant shall, upon the request of Landlord, execute, acknowledge and  deliver any and all instruments necessary to effectuate, or to give notice of, such subordination in the form of Schedule D hereto.  The word "mortgage" as used herein includes mortgages, deeds of trust and similar instruments and modifications, consolidations, extensions, renewals or substitutes therefor.

15.2    Both Landlord and Tenant recognize that with respect to major subleases Tenant may not be able to finalize the same unless Tenant is in a position to afford sublessees an agreement duly executed by Landlord by the terms of which Landlord agrees that in the event of the termination of this Lease, which termination is not due to the default of such sublessee or is not due to an occurrence with respect to the portion of the premises sublet to said sublessee, the rights of the sublessee under the sublease shall continue in full force and effect so long as the sublessee is not in such default under the sublease at such time or at any time thereafter as would entitle Tenant (as sublessor thereunder) to terminate same, or otherwise stated, that such sublease will continue as a direct lease between the sublessee on the one hand and Landlord on the other, with each party attorning to the other as though the same were a direct lease between said parties.  Accordingly, Landlord agrees to execute the instrument or instruments of the type set forth above with respect to a single sublessee of the entire Demised Premises (provided, however, that such sublessee shall not be required to occupy the entire Demised Premises); provided, further

████████████████████████████████████████████████

for a wholesale or warehouse club, a department store, a discount department store, a supermarket, a junior department store, a home improvement center, a sporting goods store, a store for children's clothing, furniture and equipment, a furniture store or an appliance or electronics store.

ARTICLE XVI

Assignment and Use; Shopping Center Restrictions

16.1     Notwithstanding any assignment of Tenant's interest in this Lease or any subletting of the whole or any part of the Demised Premises, Tenant shall remain primarily liable for the performance of all agreements of Tenant hereunder, except as expressly otherwise provided in Section 12.3.  No consent from Landlord shall be necessary with respect to any such assignment or subletting.  The Demised Premises may be used for any lawful retail purpose, which term shall be deemed to include a membership or wholesale club, including an on-premises bakery and the replacement and installation of tires and wheel balancing for automobiles.  In no event shall Tenant be obligated to open other than as provided in Section 4.8, or keep open the Demised Premises for any purpose.

16.2     Landlord agrees that no portion of the Shopping Center shall be used for any industrial or residential purposes or any entertainment purposes such as a cinema, theater, skating rink, bowling alley, bar, restaurant, discotheque, dance hall, amusement gallery, pool room, health club, massage parlor or off-track betting facility or for any so-called adult bookstore or similar business or activity appealing to pornographic interests or selling or displaying pornographic or obscene materials, and Landlord agrees that no building, sign or other improvement (other than directional signs) shall be included in the Shopping Center except as shown on the Site Plan.  Landlord agrees that the ratio of parking spaces on the Lot shall never be less than the sum of (a) 549 parking spaces serving the BJ's Tract and (b) 5 spaces per 1,000 square feet of Floor Area of all other buildings in the Lot.

Notwithstanding the foregoing to the contrary, Landlord may use portions of the Lot which are not within the BJ's Tract for the following uses, upon the following conditions:

(a)     As a motion picture theatre or cinema, so long as there shall be provided one (1) parking space for every three (3) seats within such theatre or cinema in addition to the parking otherwise required hereunder for the balance of the Shopping Center;

(b)     As a restaurant or catering hall with or without service of alcoholic beverage, so long as there shall be provided ten (10) parking spaces per 1,000 square feet of Floor Area in such restaurant in addition to the parking otherwise required hereunder for the balance of the Shopping Center;

(c)     As an amusement gallery, so long as there shall be provided five (5) parking spaces per 1,000 square feet of Floor Area in such amusement gallery in addition to the parking otherwise required hereunder for the balance of the Shopping Center; and

(d)     As a first-class, upscale pool or billiard hall of the type currently operated under the trade name "Jillian's" or "Boston Billiards", so long as (i) such pool or billiard hall is operated as part of a chain of no less than five (5) similar facilities by operators experienced in the management of such a first-class, upscale facility, and (ii) so long as there shall be provided 10 parking spaces per 1,000 square feet of Floor Area in such pool or billiard hall in addition to the parking otherwise required hereunder for the balance of the Shopping Center.

## ARTICLE XVII

17.1     Interpretation.  It is agreed that if any provision of this Lease or the application of any provision to any person or any circumstance shall be determined to be invalid or unenforceable, then such determination shall not affect any other provisions of this Lease or the application of such provision to any other person or circumstance, all of which other provisions shall remain in full force and effect; and it is the intention of the parties hereto that if any provision of this Lease is capable of two constructions, one of which would render the provision void and the other of which would render the provision valid, the provision shall have the meaning which renders it valid.

17.2     Successors and Assigns.  The words "Landlord" and "Tenant" and the pronouns referring thereto, as used in this Lease, shall mean where the context requires or admits, the persons named herein as Landlord and as Tenant, respectively, and their respective heirs, legal representatives, successors and assigns, irrespective of whether singular or plural, masculine, feminine or neuter.  The agreements and conditions in this Lease contained on the part of Landlord to be performed and observed shall be binding upon Landlord and its successors and assigns, and the agreements and conditions on the part of Tenant to be performed and observed shall be binding upon Tenant and its successors and assigns and shall enure to the benefit of Landlord and its heirs, legal representatives, successors and assigns.  If Landlord shall be more than one person, the obligations of Landlord hereunder shall be joint and several.

17.3     Delays.  In any case where either party hereto is required to do any act (other than make a payment of money) delays caused by or resulting from Act of God, war, civil commotion, fire or other casualty, labor difficulties, general shortages of labor, materials or equipment, government regulations, inclement weather or other causes beyond such party's reasonable control shall not be counted in determining the time when the performance of such act must be completed, whether such time be designated by a fixed time, a fixed period of time or "a reasonable time."  In any case where work is to be paid for out of insurance proceeds or condemnation awards, due allowance shall be made, both to the party required to perform such work and to the party required to make such payment, for delays in the collection of such proceeds and awards.  The provisions of this Article shall not apply to the dates set forth in Articles III and IV except for the Outside Delivery Date; provided, however, that Landlord shall notify Tenant of delays anticipated to extend the Outside Delivery Date within ten (10) days of the commencement of such delay and in no event shall this Article extend the Outside Delivery Date by more than sixty (60) days.

17.4     Holding Over.  If Tenant or any person claiming under Tenant shall remain in possession of the Demised Premises or any part thereof after the expiration of the term of this Lease without any agreement in writing between Landlord and Tenant with respect thereto, prior to acceptance of rent by Landlord the person remaining in possession shall be deemed a tenant at sufferance and after acceptance of rent by Landlord the person remaining in possession shall be deemed a tenant from month to month, subject to the that provisions of this Lease (except that Base Rent shall be at the rate of ███ of the amount payable for the portion of the term immediately preceding the expiration of the term) insofar as the same may be made applicable to a tenancy from month to month.  Nothing in this Section 17.4 shall be construed as a consent by Landlord to such holdover.

17.5     Waiver.  Failure of either party to complain of any act or omission on the part of the other party, no matter how long the same may continue, shall not be deemed to be a waiver by said party of any of its rights hereunder.  No waiver by either party at any time, express or

implied, of any breach of any provision of this Lease shall be deemed a waiver of a breach of any other provision of this Lease or a consent to any subsequent breach of the same or any other provision.  Any and all rights and remedies which either party may have under this Lease or by operation of law, either at law or in equity, upon any breach, shall be distinct, separate and cumulative and shall not be deemed inconsistent with each other; and no one of them, whether exercised by said party or not, shall be deemed to be in exclusion of any other; and any two or more or all of such rights and remedies may be exercised at the same time.  Without limiting the generality of the foregoing, if any restriction contained in this Lease for the benefit of either party shall be violated, such party, without waiving any claim for breach of agreement against the other party, may bring such proceedings as it may deem necessary, either at law or in equity, in its own name or in the name of the other party, against the person violating said restriction.

17.6    Disputes.  It is agreed that if at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other party under the provisions hereof, the party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest," and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said party to institute suit for recovery of such sum.  If it shall be adjudged that there was no legal obligation on the part of said party to pay such sum or any part thereof, said party shall be entitled to recover such sum or so much thereof as it was not legally required to pay under the provisions of this Lease; and if at any time a dispute shall arise between the parties hereto as to any work to be performed by either of them under the provisions hereof, the party against whom the obligation to perform the work is asserted may perform such work and pay the cost thereof "under protest" and the performance of such work shall in no event be regarded as a voluntary performance, and there shall survive the right on the part of said party to institute suit for the recovery of the cost of such work.  If it shall be adjudged that there was no legal obligation on the part of said party to perform the same or any part thereof, said party shall be entitled to recover the cost of such work or the cost of so much thereof as said party was not legally required to perform under the provisions of this Lease.

17.7    Quiet Enjoyment.  Landlord agrees that upon Tenant's paying the rent and performing and observing the agreements and conditions on its part to be performed and observed, Tenant shall and may peaceably and quietly have, hold and enjoy the Demised Premises and all rights of Tenant hereunder during the term of this Lease without any manner of hindrance or molestation.

17.8    Notices.  Any notice, consent, approval or other communication given pursuant to the provisions of this Lease shall be in writing and shall be given by mailing the same by certified mail or registered mail, return receipt requested, postage prepaid, or by Federal Express, Purolator Courier, Emery Air Freight, U.S. Post Office Express Mail, or similar overnight courier which delivers only upon signed receipt of the addressee.  The time of the giving of any notice shall be the time of receipt thereof by the addressee or any agent of the addressee, except that in the event the addressee or such agent of the addressee shall refuse to receive any notice shall be the time of such refusal or the time of such delivery, as the case may be, and except that any notice given pursuant to Article IV terminating this Lease shall be deemed given when mailed.  If sent to Landlord, the same shall be mailed to Landlord at Landlord's Address or at such other address as Landlord may hereafter designate by notice to Tenant; and if sent to Tenant, the same shall be mailed to Tenant at Tenant's Address or at such other address as Tenant may hereafter designate by notice to Landlord.

17.9    Cost and Expense.  Wherever in this Lease provision is made for the doing of any act by any person it is understood and agreed that such act shall be done by such person at its own cost and expense unless a contrary intent is expressed.

17.10   This Instrument.  This Lease is transmitted for examination only and does not constitute an offer to lease, and this Lease shall become effective only upon execution thereof by the parties thereto.  This instrument contains the entire and only agreement between the parties, and no oral statements or representations or prior written matter not contained in this instrument shall have any force or effect.  This Lease shall not be modified in any way except by a writing subscribed by both parties.

17.11   Marginal Notes.  The headings for the various provisions of this Lease are used only as a matter of convenience for reference, and are not to be considered a part of this Lease or used in determining the intent of the parties to this Lease.

17.12   Brokers.  Landlord and Tenant each warrant and represent to the other that it has dealt with no broker or agent in connection with this Lease.  Landlord and Tenant each shall defend, indemnify and hold harmless the other from and against all loss, costs or damage by reason of the warranty and representation of such party under this Section 17.12 being incorrect.

17.13   Choice of Law.  This instrument shall be construed in accordance with the laws of the State of New Jersey.

17.14   Access.  Landlord and its designees shall have the right to enter the Demised Premises upon reasonable prior notice (or, in an emergency situation, such shorter period as is reasonable in light of the exigency), at reasonable hours accompanied by an employee of Tenant to inspect the Demised Premises, and to make any repairs required of Landlord under this Lease, and during the period commencing nine (9) months prior to the end of the term, for the purposes of exhibiting the same to prospective tenants, all without unreasonably interfering with Tenant's business.   So long as Tenant or any subtenant is in occupancy of the Demised Premises, Landlord shall not post any "For Rent" or "For Sale" signs on the Building during such period.

17.15   Accord and Satisfaction.  No payment by either party or receipt by the other party of a lesser amount than the rental and other charges herein stipulated shall be deemed to be other than payment on account of the earliest rent and other charges then unpaid and due hereunder nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and either party may accept such check or payment without prejudice to its right to recover the balance of such rent and other charges or pursue any other remedy provided for in this Lease or available at law or in equity.

17.16   Landlord's Assurances.   To induce Tenant to execute this Lease, and in consideration thereof, Landlord warrants and represents, and covenants and agrees as follows:

(A) Landlord shall acquire good fee simple title to the Lot free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except the REA and the mortgage to secure Landlord's financing and those items listed on Schedule E attached hereto and made a part hereof; together with rights appurtenant to the Lot under the REA and such other easements appurtenant to the Lot as may be necessary to permit surface water drainage and utility service as shown on the Site Plan or required by the Final Details.  Concurrently with Landlord's purchase of the Lot, Landlord shall furnish to Tenant a leasehold title insurance policy, at Tenant's expense, in respect of the Lot and

such appurtenant easements, if any, including the REA, insuring title consistent with the foregoing provisions of this Paragraph (A).

(B) Prior to or concurrently with the execution and delivery of the mortgage referred to in Paragraph (A), Landlord shall cause to be delivered to Tenant a so-called nondisturbance agreement from the holder of such mortgage in the form of the agreement attached hereto as Schedule D.

(C) The Lot will, by the commencement of Landlord's Construction Work, be zoned for the uses included in the BJ's Project.

(D) This Lease does not violate the provisions of any instrument heretofore executed; and the execution of this Lease has been duly and validly authorized on behalf of Landlord.

(E) No consents are required from any tenant or occupant of the Shopping Center or from third parties in order for the BJ's Project to be constructed and operated in the Shopping Center.

(F) No known release or threat of release of Hazardous Substances (as defined in Section 17.17 of this Lease) exists in respect of the Lot.

In the event that Landlord shall fail to comply with the requirements of this Section 17.16, or in the event Landlord shall breach any of the warranties, representations, covenants or agreements set forth in this Section 17.16, and such failure or breach shall continue uncured for thirty (30) days after notice from Tenant to Landlord, Tenant shall have the right, in addition to all other remedies, to terminate this Lease at any time by giving Landlord notice thereof prior to the full compliance by Landlord with such requirements, warranties, representations, covenants and agreements. The termination of this Lease shall not affect Landlord's liability for a breach of the representations, warranties, covenants, agreements and indemnities contained in this Section 17.16. Nothing set forth in this Section 17.16 shall, however, be construed as affecting in any way the accrual and effectiveness of any of the obligations of Landlord set forth in this Lease.

17.17 Environmental Laws. Landlord shall comply with the requirements of all Federal, state, county and municipal environmental laws (the "Environmental Laws") and shall immediately, after Landlord discovers or is informed of the existence of the same, give notice to Tenant of any presence, release or threat of release of any oil, asbestos or hazardous material, substance or waste regulated under Environmental Laws (collectively, "Hazardous Substances") at, to or from the Demised Premises or the Common Areas not located on the BJ's Tract, and of any notices from any governmental authority with respect thereto. Landlord warrants and represents without limitation of Landlord's obligations under Section 17.16 of this Lease and Tenant's remedies for breach thereof, Landlord shall indemnify, defend and hold harmless Tenant from and against all claims, loss, cost and expense arising as a result of any Hazardous Substance affecting the Demised Premises or the Common Areas not located on the BJ's Tract and released prior to the Commencement Date or released on or in the portion of the Lot not included in the BJ's Tract during the term of this Lease, excluding consequential damages. Tenant shall not violate any Environmental Laws and Tenant shall indemnify, defend and hold Landlord harmless from and against all claims, loss, cost and expense arising as a result of a violation by Tenant, its subtenants or licensees of the Environmental Laws, including, without limitation, a release of Hazardous Substances by Tenant or its subtenants or licensees in, on or under the Shopping Center, or a release of Hazardous Substances on the BJ's Tract during the term of this Lease. In

the event of a release in the Shopping Center by a party which is not a tenant or lawful occupant of the Shopping Center, to the extent such party shall not pay for any required remediation, the tenants and occupants of the Shopping Center shall share such costs in accordance with their Floor Areas, and Tenant shall pay Tenant's SC Share to Landlord.

17.18  No Liability.  Anything else in this Lease to the contrary notwithstanding, Tenant shall look solely to the estate and property of Landlord in the Shopping Center for the satisfaction of any claim for the payment of money by Landlord by reason of any default or breach by Landlord of any of the terms and provisions of this Lease to be performed, fulfilled or observed by Landlord, and no other property or assets of Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies for any such default or breach.

IN WITNESS WHEREOF, the parties hereto have caused this Lease to be executed under seal as of the day and year first above written.

WITNESS:                                   HELLER-RIVERDALE, L.L.C.

                                           By:  Heller Management Corp.,
                                                  Managing Member

                                           By: _____
                                           Its:       SCOTT D. HELLER
                                                EXECUTIVE VICE PRESIDENT/GENERAL COUNSEL

WITNESSES:                                 WABAN, INC.

                                           By: _____
                                                 Herbert J. Zarkin
                                                 President

                                           By: _____

                                                 Arthur T. Silk, Jr.
                                                 Vice President and Treasurer

ID # 6577v08/8151-18
1/24/97

# EXHIBIT C

MASSOOD LAW GROUP, LLC
50 Packanack Lake Road
Wayne, NJ 07470
(973) 696-1900
PETER DE FRANK, ESQ. -035282007
Attorneys for *Plaintiff(s)*

---

| | |
|---|---|
| **KEVIN AMORUSO and RENEE AMORUSO (per quod),** | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: ESSEX COUNTY |
| Plaintiff(s), | DOCKET NO. |
| v. | *Civil Action* |
| **BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC.; JOHN DOES 1-10 (fictitious parties); JANE DOES 1-10 (fictitious parties), ABC CORPS 1-10 (fictitious parties), TUV CORPS ROOFING CONTRACTORS 1-10 (fictitious parties), XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (fictitious parties),** | **STATEMENT OF DAMAGES** |
| Defendant(s). | |

---

## STATEMENT OF DAMAGES

Pursuant to <u>R.</u> 4:5-2 the following is the amount of damages claimed in the above entitled action.

### $700,000.00

MASSOOD LAW GROUP, LLC
Attorneys for Plaintiff(s)

BY: _____
PETER DE FRANK, ESQ.

Dated: April 17, 2019

# EXHIBIT D



John M. McConnell | Partner
Direct 609.986.1326 | jmcconnell@goldbergsegalla.com

October 3, 2019

**Via E-mail pdefrank@dmcklawgroup.com and fax (973)696-4211**
Peter De Frank, Esq.
De Frank McCluskey & Kopp, LLC
50 Packanack Lake Road
Wayne, NJ 07470

Re:     **Kevin Amoruso et al. v. BJ's Wholesale Club, Inc. et als.**

Dear Peter:

Please be advised that we represent Defendant BJ's Wholesale Club, Inc. in this case. I attempted to contact you on October 3, 2019 but was unable to reach you. Specifically, I wanted to discuss the request for admissions which were purportedly attached to the Complaint. However, as I noted to you in the message that I left for you, although the caption of the Complaint suggests that there were requests for admissions attached to the Complaint, they were not indeed attached to any of the documents that were served upon BJ's. Furthermore, upon review of the docket, the Complaint that was filed did not have the request for admissions attached to it either. Therefore, I would request that you please provide the requests for admissions that were purportedly provided to us and also provide us with approximately 30 days to respond to these requests for admissions if it is your position that these were served upon my client already. However, if these were not yet served upon my client, then I would ask for the full and complete amount of time that the NJ Rules of Civil Procedure allow for my client to answer these requests for admissions and I would ask that you please serve them in accordance with the Rules of Court.

Additionally, enclosed please find a Stipulation to Limit Damages in this matter. If your client does not sign and return this by the close of business on October 4, 2019, my client has instructed me to remove this matter to the Federal Court.

Thank you very much.

Very truly yours,

*s/ John M. McConnell*
John M. McConnell

JMM:smc

**Please send mail to our scanning center at: PO Box 580, Buffalo, NY 14201**

**Office Location:** 301 Carnegie Center, Suite 200, Princeton, NJ 08540 | 609.986.1300 | Fax: 609.986.1301 | **www.goldbergsegalla.com**
CALIFORNIA | CONNECTICUT | FLORIDA | ILLINOIS | NEW JERSEY | NEW YORK | NORTH CAROLINA | MARYLAND | MISSOURI | PENNSYLVANIA | UNITED KINGDOM

John M. McConnell (Bar No.:02815-2006)
**GOLDBERG SEGALLA LLP**
Mailing address:  PO Box 580, Buffalo, NY 14201
301 Carnegie Center, Suite 200
Princeton, NJ 08540
609.986.1300
609.986.1301 (Facsimile)
Defendant BJ's Wholesale Club, Inc.

| | |
|---|---|
| KEVIN AMORUSO AND RENEE AMORUSO (PER QUOD), <br><br> Plaintiff(s), <br><br> v. <br><br> BJ'S WHOLESALE CLUB, INC.; CRESSKILL HILLS, LLC; JOHN DOES 1-10 (FICTITIOUS PARTIES); JANE DOES 1-10 (FICTITIOUS PARTIES); ABC CORPS 1-10 (FICTITIOUS PARTIES); TUV CORPS ROOFING CONTRACTORS 1-10 (FICTITIOUS PARTIES); XYZ CORPS PROPERTY MAINTENANCE/MANAGEMENT COMPANY 1-10 (FICTITIOUS PARTIES),, <br><br> Defendant(s) | : SUPERIOR COURT OF NEW JERSEY <br> : LAW DIVISION: ESSEX COUNTY <br> : DOCKET NO:  ESX-L-3172-19 <br> : <br> : <br> : <br> : <br> : <br> : **STIPULATION TO LIMIT DAMAGES** <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

Plaintiffs Kevin Amoruso and Renee Amoruso (hereinafter collectively referred to as "Plaintiffs") and Defendant BJ's Wholesale Club, Inc. hereby understand and agree to the following:

1. Defendant BJ's Wholesale Club, Inc. has the right, pursuant to 28 U.S.C. § 1441 to remove the above captioned matter to Federal Court;

2. Defendant BJ's Wholesale Club, Inc. is willing to forego this right in exchange for the agreement of Plaintiffs to limit the damages which Plaintiffs are entitled to recover in the above captioned matter, if any; and

3.   In reliance upon the expressed agreement of Plaintiffs and Defendant BJ's Wholesale Club, Inc. to the limitation of damages set forth herein, Defendant BJ's Wholesale Club, Inc. will agree not to exercise its potential right to remove the above captioned matter to the Federal Court.

Therefore, on this _____ day of_____ 2019, Plaintiffs and Defendant BJ's Wholesale Club, Inc. hereby stipulate and agree that the full amount and/or value of any and all damages (including interest, fees and costs) to which Plaintiffs may be entitled in the above captioned matter shall not exceed seventy-five thousand dollars and zero cents ($75,000.00).

**DE FRANK MCCLUSKEY & KOPP, LLC**
Attorneys for Plaintiffs
Kevin Amoruso and Renee Amoruso

**GOLDBERG SEGALLA, LLP**
Attorneys for Defendant BJ's
Wholesale Club, Inc.

BY:_____
    Peter De Frank, Esq.

BY:_____
    John M. McConnell, Esq.

Dated:

Dated: